Executone of Philadelphia, Inc., Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

Argued April 11, 1980, before President Judge CRUMLISH and Judges BLATT and CRAIG, sitting as a panel of three.

*William R. Deasey, Deasey, Scanlon & Bender, Ltd.,* with him *James H. Johnston, Cohn and Marks,* for petitioner.

*Bohdan R. Pankiw,* Assistant Counsel, with him *Steven A. McClaren,* Deputy Chief Counsel and *George M. Kashi,* Chief Counsel, for respondent.

*Gerald J. St. John,* with him *Irving R. Segal, Schnader, Harrison, Segal & Lewis, Donald F. Clarke* and *Raymond F. Scully,* for Intervenor, Bell Telephone Company of Pennsylvania.

OPINION BY JUDGE CRAIG, June 6, 1980:

Executone of Philadelphia, Inc. (Executone) petitions for review of the order of the Pennsylvania Public Utility Commission (PUC) which terminated the PUC's own investigation of tariffs filed by the Bell Telephone Company of Pennsylvania (Bell) and dismissed Executone's complaint which alleged the rates set forth in those tariffs to be below cost, and thus in violation of law.

The subject tariffs proposed rates for three telephone service installations denominated COM-KEY 718, 734, and 1434. These systems are packaged key telephone systems having various line and station capacities and offering basic service along with features such as intercom and conference calls without assistance from an attendant.

Initially, the PUC challenges Executone's standing to appeal, citing *Pennsylvania Petroleum Assoc. v. Pennsylvania Power & Light Co.,* 32 Pa. Commonwealth Ct. 19, 377 A.2d 1270 (1977), where we quashed the appeal, from a PUC rate order, of a non-profit statewide trade association of petroleum dealers, which asserted its interest only as a competitor of the utility in the energy industry, but did not allege that it or any of its members were customers of the utility. That case is inapposite because here Executone is admittedly a customer of Bell and presented evidence of its customer status. Customers of a regulated utility may clearly be aggrieved by an order of the PUC, and

therefore Executone has standing, on that basis, to bring this appeal. We therefore will deny the P.U.C.'s motion to quash. We do not address Executone's standing or lack thereof in relation to its status as a competitor of Bell in the terminal equipment market.

Executone has limited its appeal here to the rates applicable to the COM-KEY 1434 system, alleging that the PUC erred in approving those rates because "substantial evidence of record, as well as the weight of authority, established that the rates were below marginal cost [,] anticompetitive, and so unlawful."

Executone asserts that the rates approved by the PUC are unlawful because they constitute predatory pricing, under the Sherman Antitrust Act, 15 U.S.C. 2, and decisions thereunder. We are not compelled to address the legal basis or consequences of this argument, for Executone has in the first instance failed to demonstrate that the rates as approved are non-compensatory, *i.e.*, below marginal cost.

The rationale upon which the PUC approved the subject rates as reasonable, and to which Executone takes exception, was predominantly the conclusion, from Bell's Long Run Incremental Analysis (LRIA) that the rates are in fact more than compensatory, *i.e.*, the rates are expected to cover costs incurred and provide a contribution to the common overhead of the company. The results of the LRIA for COM-KEY 1434 service are as follows:

New COM-KEY to be sold

| | | |
|---|---|---|
| Total Revenue | $2,598.196 | |
| Total Cost | 2,480.292 | |
| Positive Contribution | | $ 117,904 |

COM-KEY in service

| | | |
|---|---|---|
| Recurring Revenue | 2,558,228 | |
| Recurring Cost | 2,171,911 | |
| Positive Contribution | | 386,317 |

1A2 not sold due to COM-KEY

| | | |
|---|---|---|
| Total Revenue not received | 370,097 | |
| Total Cost not incurred | 298,477 | |
| Negative Contribution | | (71,620) |

1A2 Disconnected
due to COM-KEY

| | | |
|---|---|---|
| Total Revenue lost | 616,047 | |
| Total Cost not incurred | 341,024 | |
| Negative Contribution | | (275,023) |
| Total Positive Contribution | | 504,221 |
| Total Negative Contribution | | (346,643) |
| Final Contribution—Positive | | +157,578 |

As can be seen, Bell's LRIA incorporated estimates of revenues and costs for projected sales of COM-KEY 1434 service, recurring revenues and costs for COM-KEY 1434 systems already in service, and what are termed cross-elastic costs, meaning the revenues expected to be eliminated by customers' choice of 1434 over an alternative system, currently offered, called 1A2, along with lost revenues associated with disconnection of 1A2 service as customers opt for the more modern COM-KEY system.

Executone contends that the PUC improperly considered projected revenues derived from application of the rates to COM-KEY systems already in service, arguing that the proper test for predatory pricing is that of marginal cost, which includes only those costs incurred by additional or new units of service. Thus Executone contends that, based on Bell's own analysis, the costs associated with the projected sales of COM-KEY 1434 service exceed the revenues to be realized by those sales at the proposed rates, making those rates non-compensatory and predatory.

We reject that contention. Admittedly, in economic theory, costs and revenues from existing levels of output would be irrelevant to true marginal costs of pro-

posed increases in output. However, raw economic theory is seldom if ever controlling in any case because the pragmatics of measurement, calculation, and allocation preclude a strict application of true marginal theories.[1]

If Executone would rely on that form of analysis to establish predatory pricing under antitrust standards, it is accordingly bound by the constraints placed on such analysis in decisions under the Sherman Act. In *In re IBM Peripheral EDP Devices Antitrust Litigation,* 459 F. Supp. 626 (N.D. Cal. 1978), that court addressed the utilization of cross-elastic costs in a determination of predatory pricing, stating that:

> [To] take these costs beyond the planning stage and subtract them from the new product's profits in determining whether the price set was predatory and below cost . . . would be a disincentive to research and innovation, and has all the drawbacks that calculation of opportunity costs would impose. Neither opportunity nor

---

[1] In the actual theory, marginal cost is a value determined by the additional cost necessary to produce an additional unit of output, be it product or service. Defined as such, *each and every* unit of output has its own independent, though not necessarily different, marginal cost. Accordingly, any analysis which attempts to assess the "marginal" cost of any *aggregation* of units of output necessarily departs from the constraints of the theory, and in fact such analyses move closer to some form of averaging. Additionally, if a firm or industry in a non-perfectly competitive market faces normal theoretical cost functions, there may easily be levels of output for which the price obtainable in the market, *i.e.* the average revenue per unit, exceeds the average cost of supplying the product or service (thus, a clearly compensatory price) but is for some of those units less than their theoretical marginal cost. Levels of output within that range are thus profitable although they are not profit maximizing. *See*: P. Asch, Economic Theory and the Antitrust Dilemna (1970).

impact costs (as defined here) may be included in determining whether a price is predatory. 459 F. Supp. at 631-2.[2]

If, in accordance with that decision, the cross-elastic costs of new COM-KEY 1434 service are excluded from the analysis, even Executone's "marginal" analysis would yield a positive contribution from new service alone.

Further, the economic authorities to which Executone directs us in support of its proposition expressly exclude from the category of predatory pricing those price levels which exceed average costs.[3] Under this approach, which would admit revenues and costs of existing levels of output, the proposed rates generate a positive contribution even if cross-elastic costs are included. That positive contribution establishes that the rates are compensatory because the rates must exceed the average costs of providing the service.

As the PUC noted in its opinion in this case, "[t]here is no single correct cost study or methodology that can be used to answer all questions pertaining to costs; there are only appropriate and inappropriate cost analyses depending upon the type of service under study and the management and regulatory decision in question."

We agree with the PUC that the LRIA employed here was an appropriate methodology by which to demonstrate the reasonableness of the proposed rates; it constitutes substantial evidence in support of the PUC's decision that the proposed rates were just, rea-

---

[2] "Impact costs" was the term employed in that case to denominate what we refer to as "cross-elastic costs."

[3] P. Areeda and D. Turner, Antitrust Law §713 et seq. (1978); See also, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 Harv. L. Rev. 697 (1975), by those same authors.

sonable, and not in violation of law. Accordingly, we will affirm the decision appealed from.

ORDER

AND Now, this 6th day of June, 1980, Respondent's motion to quash is denied and the appealed from order of the Pennsylvania Public Utility Commission, entered March 19, 1979 at Rate Investigation Docket Nos. 289 and 401 and complaint No. 21401, is affirmed.