**YEAGER'S FUEL, INC.; Atlantic Oil and Heating Company; Mansfeld Fuel Oil Company; Deiter Brothers Fuel Company, Inc.; Ralph D. Weaver, Inc.; C.A. Lessig, Inc.; Harned Durham Oil Company, Inc.; Schwanger Brothers & Company, Inc.; Sico Company; Whitlock & Woerth, Inc.; Zongora Fuel, Inc.; Senick, Inc.; Carlos R. Leffler, Inc.; H. John Davis, Inc.; Arthur J. Ulrich, Inc.; Union Fuel Company; Guy. Heavener, Inc.; Desousa Oil and Service Corp.; W.C. Reichenbach & Sons, Inc.; Apgar Oil Company, Inc.; and Freyman's Fuel Oil Company, Inc.**

v.

**PENNSYLVANIA POWER & LIGHT COMPANY.**

**LOSCH BOILER SALES & SERVICE, CO., Individually and on behalf of All Persons Similarly Situated**

v.

**PENNSYLVANIA POWER & LIGHT COMPANY.**

**Civ. A. Nos. 91–5176, 92–2359.**

United States District Court, E.D. Pennsylvania.

Sept. 8, 1992.

As Amended Oct. 5, 1992.

David L. Pennington, Catherine Panchou Cox, Brian P. Kirby, Robert Thomas Connor, Harvey, Pennington, Herting & Renneisen, Ltd., Philadelphia, Pa., for plaintiffs in No. 91–CV–5176.

Harold E. Kohn, Wayne M. Thomas, Kohn, Savett, Klein & Graf, P.C., Philadelphia, Pa., for movants in No. 91–CV–5176.

Wayne M. Thomas, Kohn, Savett, Klein & Graf, P.C., Philadelphia, Pa., for plaintiff in No. 92–CV–2359.

Jeffrey H. Howard, Christopher C. Fennell, Crowell & Moring, Washington, D.C., for defendant in Nos. 91–CV–5176, 92–CV–2359.

## OPINION

PADOVA, District Judge.

This consolidated action concerns a dispute over who will supply the heat to Penn-

sylvania homeowners when they reach for their thermostats—fuel oil dealers or an electric utility. Plaintiffs, fuel oil dealers and related heating equipment suppliers, claim that defendant, an electric utility, has been increasing its share of the home heating market within its service area through methods that violate federal antitrust and racketeering laws and state laws. Moving for summary judgment of plaintiffs' federal claims, defendant responds that the conduct challenged by plaintiffs is part and parcel of the Commonwealth of Pennsylvania's energy conservation policies; hence plaintiff is immune from federal antitrust and racketeering liability under *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).[1] Because I have determined that defendant's alleged anti-competitive conduct has been conducted pursuant to a clearly articulated state policy and under active state supervision, I will grant defendant's motion for summary judgment under *Parker* as to plaintiffs' federal antitrust claims. Because plaintiffs have failed to state a cause of action under the federal racketeering statute, I will grant defendant's motion on that claim as well. Finally, because I will discharge each of plaintiffs' federal claims, I will exercise my discretion to dismiss plaintiffs' pendent state law claims.

BACKGROUND

I. FACTUAL ALLEGATIONS [2]

Defendant Pennsylvania Power & Light Company ("PP & L") is essentially the sole source of electric power for residences in Allentown, Pennsylvania and the surrounding area. *Yeager* Amended Complaint at ¶ 24; *Losch* Complaint at ¶¶ 7, 14. Plaintiffs sell heating oil and related heating equipment primarily to homeowners living within PP & L's service area. *Yeager* Amended Complaint at ¶¶ 3–24; *Losch* Complaint at ¶¶ 6, 9.

Some time after 1978, PP & L began promoting the use of electric heat pumps

as energy conservation devices for use in new residential construction throughout its service area. *Yeager* Amended Complaint at ¶ 26. To encourage the use of electric heat pumps in new homes, PP & L offers "cash incentives" or "rebates" to builders and developers who install electric heat pumps (approximately $1,000 per heat pump) and reduced electric rates for a limited time to those who purchase homes equipped with these devices. *Yeager* Amended Complaint at ¶¶ 28–29, 31; *Losch* Complaint at ¶¶ 15–16, 18.

PP & L approaches builders and developers with its electric heat pump cash incentive offer early in the building process, when arrangements are made to supply electricity during construction. *Losch* Complaint at ¶ 15. To receive the cash incentive, builders or developers must order the electric heat pumps and have them installed by heat pump manufacturing and installation firms selected by PP & L. *Yeager* Amended Complaint at ¶ 29; *Losch* Complaint at ¶ 16.

PP & L approaches new homeowners with its reduced electric rate offer through the builders and developers as well. PP & L offers to designate new homes that utilize electric heat pumps installed through the cash incentive program as "Four Star" homes, entitling the new homeowners to reduced electric rates. *Yeager* Amended Complaint at ¶ 31; *Losch* Complaint at ¶ 18. This rate discount is termed the "RTS Rate." *Id.* Apart from their obvious attraction to homeowners, the "Four Star" designation and the RTS Rate are presumably added incentives to builders and developers, who can number among the selling points of their homes discounts on electric utility bills. *Yeager* Amended Complaint at ¶ 31; *Losch* Complaint at ¶ 18.

By plaintiffs' estimates, the result of PP & L's cash incentive and reduced electric rate programs is that between 70 and 85 percent of the new homes constructed in

---

1. Defendant also attacks these claims on a variety of other grounds, none of which do I reach here.

2. The following factual allegations reflect a consolidation of pertinent averments contained in complaints filed in *Yeager's Fuel Inc. v. Pennsyl-*

*vania Power & Light Co.*, Civil Action No. 91–5176 (the *"Yeager"* case), and *Losch Boiler Sales & Service, Co.*, Civil Action No. 92–2359 (the *"Losch"* case). *See infra* section II for the procedural history of these cases.

PP & L's service area since the early 1980s have been built with electric heat pumps, rather than fuel oil or other heating systems. *Yeager* Amended Complaint at ¶ 32; *Losch* Complaint at ¶ 20. Moreover, plaintiffs assert that the owners of these electrically heated homes are effectively "locked into" electric heat because of the high cost of converting to other heating systems. *Losch* Complaint at ¶ 22.

The apparent success of PP & L's programs, plaintiffs contend, has had a severe anti-competitive impact on the markets for heating fuel and related heating equipment in new residential construction within PP & L's service area. *Yeager* Amended Complaint at ¶ 33; *Losch* Complaint at ¶ 28. Plaintiffs claim that PP & L's programs have foreclosed competition in these markets and that consequently they have been injured in their business and property. *Yeager* Amended Complaint at ¶ 33; *Losch* Complaint at ¶¶ 28, 30. Plaintiffs ultimately attribute the anti-competitive impact of PP & L's electric heat pump incentive programs to PP & L's misuse of

> (a) its status as the sole provider of electricity in its geographical area; (b) its advance knowledge of all new construction in its geographical area; (c) general ratepayer revenues to pay subsidies to contractors, builders and developers to purchase electric heat pumps; and (d) its payment from general ratepayer revenues to pay subsidies to new homeowners in "Four Star" homes. . . .

*Losch* Complaint at ¶ 24.

## II. PERTINENT PROCEDURAL HISTORY

### A. *The Yeager case*

In August 1991, twenty-one fuel oil and/or fuel oil heating equipment dealers filed a complaint, subsequently amended, in this Court against PP & L based upon the above factual allegations. This civil action is docketed as No. 91–5176 and will be referred to as the *Yeager* case. The *Yeager* amended complaint alleges violations of section 1 of the Sherman Act, 15 U.S.C.A. § 1 (West Supp.1992) (unlawful restraint of trade); section 2 of the Sherman Act, 15 U.S.C.A. § 2 (West Supp.1992) (unlawful monopolization); section 2(c) of the Robinson–Patman Act, 15 U.S.C.A. § 13(c) (West 1973) (unlawful payment of commission, brokerage or other compensation); section 3 of the Clayton Act, 15 U.S.C.A. § 14 (West 1973) (unlawful product tying arrangement); and section 1962(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.A. § 1962(c) (West 1984) (unlawful racketeering activity).

In November 1991, PP & L moved to dismiss this amended complaint pursuant to Fed.R.Civ.P. 12(b)(6), asserting immunity from antitrust and RICO liability under the so-called state action doctrine, set forth in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), and challenging each of plaintiffs' causes of action for failure to state a claim. Because PP & L submitted with its motion a number of materials outside of the pleadings, particularly with regard to state action immunity, the Honorable Franklin S. Van Antwerpen of this Court ordered that PP & L's motion to dismiss be converted into a motion for summary judgment and granted plaintiffs an additional ninety days to take discovery and respond to the motion.[3]

On April 9, 1992, Judge Van Antwerpen dismissed PP & L's converted summary

---

**3.** This case was originally assigned to Judge Van Antwerpen in accordance with this Court's procedure for the random assignment of cases. On May 12, 1992, the case was reassigned to me in accordance with that same procedure.

The parties dispute whether Judge Van Antwerpen's order converted PP & L's *entire* motion to dismiss into a motion for summary judgment or only that *portion* of the motion to dismiss concerning state action immunity, for which materials beyond the pleadings had been submitted. The implication of this distinction is

that plaintiffs' response to the converted motion for summary judgment only provides evidence beyond the pleadings on the state action immunity issue, while standing on the pleadings with regard to the sufficiency of each cause of action. PP & L, on the other hand, seeks application of the summary judgment standard enunciated in *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (requiring parties responding to a motion for summary judgment to go beyond the pleadings to show that there is a genuine issue for trial),

judgment motion without opinion and without prejudice to PP & L's right to reassert fully the motion at a later date. Relying solely upon the papers it filed in support of its November 1991 motion to dismiss, PP & L reasserted this converted motion for summary judgment 4 days later, on April 13. It is this motion for summary judgment as to plaintiffs' federal antitrust and racketeering claims that is presently before the Court.

## B. *The Losch case*

In April 1992, plaintiff Losch Boiler Sales & Service Co., a fuel oil and related heating equipment dealer, filed a complaint against PP & L in this Court on behalf of itself and all persons similarly situated. This civil action is docketed at No. 92–2359 and will be referred to as the *Losch* case.[4] Like *Yeager*, *Losch* is based upon the above factual allegations. With respect to specific causes of action, the *Losch* complaint is virtually identical to the *Yeager* amended complaint, except as follows: (1) the *Losch* complaint alleges violations of sections 2 and 3 of the Robinson–Patman Act, 15 U.S.C.A. §§ 13 and 13a (West 1973) (unlawful price, rebate and discount discrimination); (2) the *Losch* complaint does not allege a RICO violation; and (3) the *Losch* complaint contains a claim of civil conspiracy and unfair competition under Pennsylvania state law.[5]

On May 12, 1992, the *Losch* plaintiff filed a motion for class determination, which remains undecided. In response, PP & L moved to stay *Losch*, pending a decision on its motion for summary judgment in *Yeager*. Opposed to a stay, the *Losch* plaintiff in turn filed a motion to consolidate and coordinate this action with *Yeager*. Following oral argument on both the motion to stay and the motion to consolidate, during which counsel for all parties in both *Yeager* and *Losch* participated, I entered an order on June 11, 1992, with the consent of the parties, consolidating *Yeager* and *Losch* for purposes of the pending motion for summary judgment in *Yeager*. The effect of that order is to treat the summary judgment motion and all responses filed in *Yeager* as if they were also filed in *Losch*, binding all parties in both cases to the Court's ruling.

## DISCUSSION

### I. SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Whether a fact is *material* will be determined by reference to the "substantive evidentiary standards that apply to the case." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Whether a *genuine* issue of material fact is presented will be determined by asking if "a reasonable jury could return a verdict for the non-moving party." *Id.*

Rule 56 requires opposition to a proper motion for summary judgment to be made by submission "of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Such evidence and all justifiable inferences that can be drawn from it are to be taken as true. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513. Such evidence need not be presented in a form admissible at trial. *Id.*

---

to each of plaintiffs' claims. Because I will grant PP & L's motion for summary judgment as to all antitrust claims under the state action doctrine and dismiss plaintiffs' RICO count for failure to state a claim under the Fed.R.Civ.P. 12(b)(6) standard, I need not resolve this dispute.

4. Like the *Yeager* action, this case was originally assigned to Judge Van Antwerpen in accordance with the Court's procedure for the random assignment of cases. On May 15, 1992, the case was reassigned to me in accordance with that same procedure.

5. The *Yeager* complaint alleges only a violation of section 2(c) of the Robinson–Patman Act, contains a RICO count, and does not include any state law claims.

My analysis of PP & L's motion will be guided by these standards.

## II. STATE ACTION IMMUNITY

Under the doctrine set forth by the United States Supreme Court in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), those who engage in otherwise unlawful anti-competitive conduct are exempt from federal antitrust liability if "first, the State has articulated a clear and affirmative policy to allow the anti-competitive conduct, and second, the State provides active supervision of anti-competitive conduct undertaken by private actors." *Federal Trade Comm'n v. Ticor Title Ins. Co.*, — U.S. —, —, 112 S.Ct. 2169, 2175, 119 L.Ed.2d 410 (1992). This two-part test of so-called state action immunity first crystallized in *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980), and has come to be known as the *Midcal* test.

PP & L contends that judgment should be entered in its favor as a matter of law as to plaintiffs' antitrust and racketeering claims because the conduct alleged by plaintiffs satisfies both prongs of the *Midcal* test. For the reasons that follow, I agree with PP & L that it has satisfied both prongs of *Midcal* and that it is immune from antitrust liability under *Parker* for the conduct complained of by plaintiffs.[6] I take no position on the application of *Parker* immunity to plaintiffs' federal racketeering claims.

### A. Clear and Affirmative State Policy

■ The Court of Appeals for the Third Circuit recently noted that two Supreme Court cases "are central to an understanding of *Midcal*'s first prong, which requires that a state policy must be clearly articulated and affirmatively expressed in order to confer antitrust immunity." *Ticor Title Ins. Co. v. Federal Trade Comm'n*, 922 F.2d 1122, 1130 (3d Cir.1991), *rev'd on oth-*

er grounds, — U.S. —, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992). Those cases are *Southern Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985) and *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985).

In *Southern Motor Carriers*, the Court addressed the question of whether "rate bureaus" composed of common motor carriers that submitted joint rate proposals to state public utility commissions were immune from antitrust liability under *Parker*. 471 U.S. at 50, 105 S.Ct. at 1723. In finding the rate bureaus immune from antitrust liability, the Court issued two significant holdings relevant at present. First, it made clear that *Midcal's* two-prong test is "applicable to private parties' claims of state action immunity." *Id.* at 61, 105 S.Ct. at 1729. Second, it held that "a state policy that expressly *permits*, but does not compel, anti-competitive conduct may be 'clearly articulated' within the meaning of *Midcal*." *Id.* (emphasis in original) (footnote omitted).

*Town of Hallie* involved allegations of anti-competitive conduct against a Wisconsin municipality that refused to supply sewage treatment services to nearby towns, but would supply these services to neighboring landowners if they agreed by referendum to have their homes annexed to the municipality. 471 U.S. at 37, 105 S.Ct. at 1715. The offending municipality sought protection under *Parker*, arguing that these activities were conducted pursuant to a state statute that permitted municipalities to provide utility service to specifically delineated areas. *Id.* at 41, 105 S.Ct. at 1717. The plaintiff towns countered that this statute could not confer antitrust immunity because it was, at a minimum, neutral on anti-competitive conduct. *Id.* at 41–42, 105 S.Ct. at 1718. The Court disagreed with the plaintiffs, holding that the statute had satisfied the first prong of *Midcal* be-

---

**6.** Whether a defendant's conduct is immune from antitrust liability under the state action doctrine "involves a question of law" and "has generally been resolved on a motion to dismiss or a summary judgment motion." *Euster v.*

*Eagle Downs Racing Ass'n*, 677 F.2d 992, 997 (3d Cir.), *cert. denied sub nom., Euster v. Pennsylvania Horse Racing Ass'n*, 459 U.S. 1022, 103 S.Ct. 388, 74 L.Ed.2d 519 (1982).

**706**

cause the state "has delegated to the cities the express authority to take action that *foreseeably* will result in anti-competitive effects" and that "the legislature contemplated the kind of action complained of." *Id.* at 43, 44, 105 S.Ct. at 1718, 1719 (emphasis added) (quotation omitted).

Since the Supreme Court handed down these two first-prong *Midcal* decisions, the Third Circuit issued two important first-prong *Midcal* decisions of its own, which are very instructive here. The first is *Hancock Indus. v. Schaeffer*, 811 F.2d 225 (3d Cir.1987). There, waste haulers filed suit under the equal protection clause, the due process clause and the federal antitrust laws against a county and a county waste authority for closing two county-owned landfills to out-of-county wastes. *Id.* at 227. Finding, *inter alia,* that the defendants were immune from antitrust liability under *Parker,* the district court granted summary judgment to the defendants. *Id.* at 228–29. The waste haulers appealed this ruling as to the county waste authority defendant. *Id.*

The county waste authority argued on appeal that it was immune from antitrust liability under *Parker* because its actions were taken pursuant to a state statute requiring municipalities to be responsible for municipal waste generated or present within their borders and to submit detailed waste management plans to the Pennsylvania Department of Environmental Resources. *Id.* at 233.[7] The Third Circuit agreed:

> On its face, the exclusion of out-of-county waste from a landfill acquired by a municipal authority organized to fulfill a county's obligation to provide for disposal of that county's waste appears *logically to result* from the duty placed upon the municipality by the state statute. Indeed, it would appear illogical to assume

that the legislature contemplated that a municipal authority-owned landfill would be required to accept waste from other municipalities.... Although defendants were not compelled to exclude out-of-county waste, once the decision was made to provide for disposal of municipal waste through the acquisition of a landfill, *the possibility of such exclusion logically followed.*

*Id.* (emphasis added). The court went on to hold that the *subjective* motivations of the state legislature in enacting a particular statute are irrelevant to the antitrust immunity analysis; rather, the inquiry focuses on whether anti-competitive conduct is *objectively* foreseeable or follows logically from what public decision-makers have done. *Id.* at 234.

The other pertinent first-prong *Midcal* decision of the Third Circuit is *Ticor Title Ins. Co. v. Federal Trade Comm'n,* 922 F.2d 1122, *rev'd on other grounds,* — U.S. —, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992).[8] Title insurance companies in that case were found by the Federal Trade Commission ("FTC") to be in violation of federal antitrust law by collectively setting rates in six states for title search and examination services. *Id.* at 1124. Among other defenses, the insurers interposed *Parker* immunity. *Id.* at 1125–26. The FTC rejected this defense as it applied to the insurers' collective rate-setting conduct in New Jersey and Pennsylvania because it could not identify clearly articulated state policies to displace competition with regulation. *Id.* at 1126. On the appeal of insurer Ticor, the Third Circuit vacated the FTC's decision.

The FTC had based its rejection of Ticor's *Parker* defense as to Pennsylvania on the definition of "fee" found in a state statute that delegates to the Pennsylvania

---

**7.** There was no dispute that the county waste authority lawfully owned the landfill pursuant to this statute. *Id.*

**8.** Because the Supreme Court's recent reversal of this case was limited to the Third Circuit's second-prong *Midcal* (active state supervision) analysis, and the Third Circuit's first prong *Midcal* analysis was not even an issue upon which

certiorari was granted, *Federal Trade Comm'n v. Ticor Title Ins. Co.,* — U.S. at —, 112 S.Ct. at 2174–76, the Third Circuit's first-prong *Midcal* analysis in *Ticor* is still the law of this Circuit and will be followed by this Court. To avoid confusion, I will refer to the Third Circuit's decision as *Ticor* and the Supreme Court's decision as *Ticor II.*

Insurance Department broad responsibility to enforce the Commonwealth's insurance laws. *Id.* at 1133–34. "Fee" under this statute excludes, *inter alia,* charges paid to an attorney acting as an independent contractor. *Id.* at 1133. Because of this exclusion, the FTC reasoned, state action immunity was not available to title insurers that collectively set the rates for title search and examination services performed by attorney-agents as no state policy sanctioned this particular conduct.

Examining the statute more carefully, the Third Circuit noted that title insurers or the rating organizations to which they belong are required to file a manual of fees with the Pennsylvania Insurance Department. *Id.* Although the Insurance Department must "reject any filings that do not 'meet the requirement of this article,'" according to the statute, the Insurance Department nonetheless approved Ticor's collectively set attorney-agent rates. *Id.* at 1134 (quoting 40 Pa.Stat.Ann. § 910–40(a) (Purdon 1971 & Supp.1990)). This approval, concluded the court, was in effect a reasonable interpretation of the statute by the Insurance Department to include attorney-agents within the definition of "fee" that, the court surmised, would be accepted by the Supreme Court of Pennsylvania were it to consider the issue.[9] Thus, Pennsylvania had clearly articulated a state policy of collective rate setting that encompassed attorney-agents, making Ticor immune from antitrust liability. *Id.* at 1134–35.

With these Supreme Court and Third Circuit decisions in mind, I now turn to the facts of the instant case. PP & L contends that Pennsylvania has clearly articulated and affirmatively expressed a policy of energy conservation and load management[10] that permits PP & L to offer the electric

heat pump incentive programs at issue here and renders PP & L immune from antitrust liability. As evidence of this policy, PP & L points to Pennsylvania's Public Utility Code, 66 Pa.Cons.Stat.Ann. §§ 101 *et seq.* (Purdon 1979 & Supp.1992) (the "Code") and the Pennsylvania Public Utility Commission's ("PUC") policy statements and interpretations of the Code. Section 524 of the Code states:

(a) General rule— ... each public utility producing, generating, distributing or furnishing electricity shall submit annually to the [PUC] information concerning its future plans to meet its customer demand, including, but not limited to, the following data:

. . . . .

(3) A year-by-year examination of the potential for promoting and ensuring the full utilization of all practical and economical energy conservation for the next 20 years and a discussion of how existing and planned utility programs do or do not adequately reach this potential. *Such programs should include, but not be limited to, educational, audit, loan, rebate, third-party financing and load management efforts to shift load from peak to off-peak periods.*

66 Pa.Cons.Stat.Ann. § 524(a) (Purdon Supp.1992) (emphasis added). PP & L contends that the cash incentives it pays builders and developers for each electric heat pump installed and the RTS Rate provided to homeowners who buy homes equipped with electric heat pumps are simply its response to the "rebate" and "load management" programs suggested in, if not compelled by, this section of the Code. The cash incentive program, PP & L argues, is the "rebate" program to which this section refers; the cash incentive program as well

---

**9.** The Supreme Court of Pennsylvania has not addressed the issue. *Id.*

**10.** "Load Management" refers to techniques of shifting demand for electrical power from periods of high peak usage to periods of time when demand is reduced. Pennsylvania Public Utility Commission, Bureau of Conservation, Economics and Planning, *Time-of-Use-Rates* at 3 (1990). Because electrical energy cannot be

stored effectively, electrical power plants must be designed to meet maximum power demand at any time. *Id.* Shifting power demand to "off-peak" times can result in reduced fuel costs and the deferral of new power plant construction in that "peak" demand will be lower, and facilities supplying that demand can be smaller. *Id.*

as the RTS Rate program is a "load management" program.

*Town of Hallie* holds that the first prong of *Midcal* can only be satisfied if (1) a clearly articulated and affirmatively expressed state policy " 'contemplated the *kind of* action complained of,' " 471 U.S. at 44, 105 S.Ct. at 1719 (quoting *City of Lafayette v. Louisiana Power & Light, Co.*, 435 U.S. 389, 415, 98 S.Ct. 1123, 1138, 55 L.Ed.2d 364 (1978)) (emphasis added), and (2) such conduct foreseeably will result in anti-competitive effects. *Id.* 471 U.S. at 43, 105 S.Ct. at 1718. Accordingly, I consider first whether the Pennsylvania legislature contemplated programs such as PP & L's, and then turn to the foreseeability of their alleged anti-competitive effects.

The Code does not define "rebate" or "load management" programs. And neither counsel nor my research has revealed any Pennsylvania decision coloring these terms. Hence, as the Third Circuit was required to do in *Ticor,* I must predict how the Supreme Court of Pennsylvania would interpret these terms to determine whether this statute encompasses PP & L's programs. *Ticor,* 922 F.2d at 1134. Also like

the Third Circuit in *Ticor,* my prediction will be guided by reference to the state agency charged with implementing the Code—the PUC.[11] *Id.* at 1132, 1134.

The PUC has both expressly and by implication spoken on what it believes the legislature had in mind by these terms and whether the PP & L programs at issue here come within the legislature's intent.[12] First, the PUC's Bureau of Conservation, Economics & Energy Planning ("BCE & EP") has expressed affirmatively its views on PP & L's programs.[13] A November 1989 final staff report prepared by the BCE & EP memorializes its investigation into the nature of PP & L's new construction incentive programs. *See* Pennsylvania Public Utility Commission, Bureau of Conservation, Economics & Energy Planning, *Pennsylvania Power and Light Company's Residential Off-Peak Electric Heating Program—New Construction and Conversions* (Nov.1989) (*"1989 BCE & EP Report "*). The BCE & EP specifically concludes there that PP & L's cash incentives are "rebates" and that these rebates, along with the RTS Rates, constitute a "legitimate load management tool." *Id.* at 2–3, 5.

**11.** Like the Pennsylvania Insurance Commission in *Ticor,* the PUC has been entrusted by the Pennsylvania legislature with "full power and authority ... to enforce, execute and carry out, by its regulations, orders, or otherwise, all and singular, the provisions of [the Code] *and the full intent thereof."* 66 Pa.Cons.Stat.Ann. § 501(a) (Purdon 1979) (emphasis added). The PUC also has authority to evaluate the prudence and cost-effectiveness of "load management" programs. 66 Pa.Cons.Stat.Ann. § 1319(a). With such broad power to implement both the language and intent of the Code, the PUC's construction of the Code will be given substantial weight here. *See Ticor,* 922 F.2d at 1134 (quoting *Masland v. Bachman,* 473 Pa. 280, 374 A.2d 517, 522 (1977), for the proposition that in Pennsylvania, a specialized agency's interpretations of a statute it has been entrusted with implementing are " 'entitled to significant weight' ").

**12.** The PUC's own policy statements may have stimulated the legislature to enact section 524 in the first place, which became effective July 10, 1986. In 1982, the PUC published a proposed policy statement of conservation and load management, suggesting that Pennsylvania electric utilities consider, *inter alia,* "joint customer/company financing programs for residential

and small commercial customers ... [and] rate induced or company controlled load management programs." 12 Pa.Bull. 3698 (Oct. 9, 1982). In 1983, the PUC formally adopted this policy statement, finding authority "to mandate the implementation of conservation and load management programs" from the Code's broad conferral of power upon the PUC. 13 Pa.Bull. 3222, 3223 (Oct. 22, 1983). This authority to mandate conservation and load management programs was subsequently called into question by the Supreme Court of Pennsylvania in June 1986 in *Process Gas Consumers Group v. Pennsylvania Pub. Util. Comm'n,* 511 Pa. 88, 511 A.2d 1315 (1986). However, with the enactment of section 524 in July 1986, the Pennsylvania legislature expressly invested the PUC with the authority to "order" electric utilities to establish conservation and load management programs "that the ... [PUC] determines to be prudent and cost-effective." *See* 66 Pa.Cons.Stat.Ann. § 1319(a)(2).

**13.** The Pennsylvania legislature has charged the BCE & EP with studying and researching "all matters within the [PUC's] jurisdiction." 66 Pa. Cons.Stat.Ann. § 308(c) (Purdon 1979). In the words of the PUC, the BCE & EP was also meant to develop "an effective program of energy conservation." 13 Pa.Bull. at 3223.

In a subsequent 1991 report, the BCE & EP describes the PP & L RTS Rate as a demand or load management technique of reducing peak loads by encouraging, through reduced electric rates, the use of "residential thermal storage" (hence "RTS") units in homes.[14] *See* Pennsylvania Public Utility Commission, Bureau of Conservation, Economics & Energy Planning, *1991 Conservation Activities*, 33–36, 126 (July 1991) (*"1991 BCE & EP Report"*).

In addition to these statements by the BCE & EP, the entire PUC has also spoken on the nature of these programs. Although the PUC has not promulgated formal regulations clarifying "rebate" and "load management," it has ordered the publication of proposed regulations indicating "that utilities may offer rebates and other incentives to encourage demand management programs." 21 Pa.Bull. 1840, 1842 (Apr. 20, 1991). Perhaps more significantly, the PUC has accepted PP & L's RTS Rate in some 23 PP & L tariff filings from 1980 to 1991.[15] *See* Affidavit of Jerry Rich, Secretary of Pennsylvania Public Utility Commission, and attached exhibits. And on at least one occasion, the PUC specifically addressed and approved the RTS Rate in a contested rate proceeding, explaining that the RTS Rate has "load management capability." *See Pennsylvania Pub. Util. Comm'n v. Pennsylvania Power & Light Co.*, 55 P.U.R.4th 185, 239,

250 (1983); *see also Pennsylvania Pub. Util. Comm'n v. Pennsylvania Power & Light Co.*, 67 P.U.R.4th 30, 90 (1985) (approving increase to the RTS Rate).[16]

There can be no doubt from this review of the Code and the statements of the agency charged with its enforcement that Pennsylvania has clearly articulated and affirmatively expressed a policy of encouraging, if not compelling, Pennsylvania electric utilities to develop and operate "rebate" and "load management" programs. Nor can there be any doubt from this review that the PP & L programs at issue here are the "kind of" programs contemplated by that policy. *See Town of Hallie*, 471 U.S. at 44, 105 S.Ct. at 1719. Like the Third Circuit in *Ticor*, I predict that the Supreme Court of Pennsylvania would defer to what I consider the PUC's and PP & L's, reasonable construction of the Code and would find that programs such as PP & L's cash incentive and RTS Rate programs are "rebate" and "load management" programs.[17] *See Ticor*, 922 F.2d at 1132, 1134; *supra* note 10 (The PUC has been invested by the Pennsylvania legislature with authority to determine the prudence and cost-effectiveness of load management programs and to implement both the language and the intent of the Code.). Put differently, PP & L's programs on their face *logically follow* from a state policy that encourages rebate and load

---

**14.** A residential thermal storage unit electrically heats water during off-peak hours for later use during peak hours. *See id.* at 34.

**15.** The rates specified in these tariffs are the "lawful rates" PP & L may charge, and PP & L is not permitted to demand or receive a rate greater to or less than that provided in the tariff. 66 Pa.Cons.Stat.Ann. § 1303 (Purdon 1979).

**16.** If the PUC determines that tariff rates are "unjust or unreasonable, or in anywise in violation of law," it must determine the "just and reasonable rate to be charged or applied by the public utility for the service in question." 66 Pa.Cons.Stat.Ann. § 1308(c) (Purdon 1979). *See also* 66 Pa.Cons.Stat.Ann. § 1309(a) (Purdon Supp.1992).

**17.** Plaintiffs present no evidence whatsoever that PP & L's programs do not have at least some load shifting effect. Plaintiffs' evidence

consists entirely of documents suggesting that PP & L's programs may not be cost-effective and may have a coincident effect of increasing load and PP & L's share of the home heating market. At best, this evidence goes only to the question of how well PP & L's programs serve the state policy, which does not bear on whether the state policy permits the programs in the first place. The former question is one for the state, not this Court, to address. *Cf. Town of Hallie*, 471 U.S. at 44 n. 7, 105 S.Ct. at 1719 n. 7 (Federal courts are not required to "embroil" themselves in unnecessary interpretation of state statutes, which would undercut fundamental policy of federalism and state sovereignty in *Parker.*); *Ticor II*, —— U.S. at ——, 112 S.Ct. at 2177 (The second prong *Midcal* inquiry "is not to determine whether the State has met some normative standard, such as efficiency, in its regulatory practices."). Whether the state has conducted an evaluation of PP & L's programs will be addressed when I turn to *Midcal's* second prong.

management programs. *See Hancock*, 811 F.2d at 233.

Having determined that PP & L's programs are the type of programs' contemplated by Pennsylvania's rebate and load management policy, the next issue to be addressed is the alleged anti-competitive impact of these programs. Plaintiffs argue that a state policy cannot satisfy the first prong of *Midcal* unless the policy is intended expressly to displace competition, and Pennsylvania's policy of encouraging/compelling rebate and load management programs lacks an intent to displace competition in the heating fuel and heating equipment markets. The notion that policy-makers must have intended expressly the specific anti-competitive conduct complained of was abandoned, however, by the Supreme Court in *Town of Hallie*, 471 U.S. at 43, 105 S.Ct. at 1718. As described in that case, a clearly articulated and affirmatively expressed state policy that *foreseeably* results in anti-competitive effects will satisfy *Midcal*'s first prong. The inquiry is objective: This Court need not identify the subjective motivations of the policy-makers. *Hancock*, 811 F.2d at 234 (quoting *Llewellyn v. Crothers*, 765 F.2d 769, 774 (9th Cir.1985)).

Here, it is entirely foreseeable that a state policy promoting electric utility rebates and load management programs will result in electric utility programs such as PP & L's, which offer rebates to those who purchase load-shifting electric heat pumps and discounts to those who operate these heating systems. It is also entirely foreseeable that such programs will, almost by definition, affect competition in the markets for heating equipment and, necessarily, the heating fuel it consumes: Electric utility rebates and discounts surely will make electric power more attractive, and the anti-competitive nature of rebates and discounts is so apparent that it is specifically addressed in the Robinson–Patman Act. *See* 15 U.S.C.A. § 13a. Indeed, the PUC, the agency charged with determining the prudence and cost-effectiveness of such programs, has actually considered the alleged anti-competitive effects these programs may have. *See, e.g.*, 21 Pa.Bull. at

1841–43 (PUC considering anti-competitive aspects of load management programs); *1989 BCE & EP Report* (considering the alleged anti-competitive impact of the PP & L programs at issue here and concluding that these are legitimate load management programs). Furthering a clearly articulated and affirmatively expressed Pennsylvania policy that will foreseeably result in the anti-competitive conduct complained of by plaintiffs, PP & L's programs satisfy the first prong of *Midcal.*

▆▆▆ Plaintiffs offer two additional arguments in opposition to this conclusion, both of which I reject. First, plaintiffs posit that PP & L cannot take advantage of *Parker* immunity in this instance because its rebate and discount rate programs were created pursuant to the Public Utility Regulatory Policies Act of 1978, 16 U.S.C. §§ 2601 *et seq.* ("PURPA"), section 4 of which, plaintiffs urge, takes away state action immunity:

> Nothing in this Act or in any amendment made by this Act *affects—*
>
> (1) the *applicability* of the antitrust laws to any electric utility or gas utility....

16 U.S.C. § 2603(1) (emphasis added). Without citation to interpretative case law or legislative history, plaintiffs attribute a more tortured meaning to the phrase "affects the applicability" than can reasonably be taken from the context. That PURPA does not "affect the applicability" of the antitrust laws to utilities cannot mean that PURPA reserves only antitrust liability but not antitrust defenses. This phrase can only mean that PURPA was not meant to affect *in any way* the application of the antitrust laws, which application is necessarily guided by the specific elements of the antitrust laws and whatever defenses exist. *See* H.R.Conf.Rep. No. 1750, 95th Cong., 1st Sess. 68, *reprinted in*, 1978 U.S.Code Cong. & Admin.News 7659, 7797, 7802 (explanation by conference committee that PURPA should not "add or subtract from the immunities and defenses available under [the antitrust laws]"). Thus I reject plaintiffs' interpretation. I also reject the

purported relevance of this statute to the instant analysis, regardless of plaintiffs' reading. *Federal* legislative intent has no bearing on the issue of whether a defendant's conduct is immune from antitrust liability under the *state* action doctrine. *See Hancock*, 811 F.2d at 234 n. 6.

Finally, plaintiffs argue that *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), compels a different result. In *Cantor*, the Court considered whether an electric utility's program of giving away free electric light bulbs to its customers was exempt from antitrust liability under *Parker*. *Id.* at 581, 96 S.Ct. at 3113. The light bulb giveaway had started in the late 1800s and continued for years, first receiving tariff approval from a state regulatory agency in 1916. *Id.* at 582–83, 96 S.Ct. at 3113. Based upon the following facts, the Court held that the utility was not exempt from antitrust liability under *Parker:* (1) the distribution of light bulbs was unregulated in the state; (2) no state statute mentioned the light bulb giveaway; (3) neither the state agency charged with regulating utilities nor the state legislature had made a specific investigation of the desirability of the light bulb giveaway or its anti-competitive effects; (4) the light bulb giveaway was started long before the state regulatory agency was even created; (5) other electric utilities in the state did not give away light bulbs; and (6) tariff approval by the state agency did not implement any state policy. *Id.* at 583–85, 96 S.Ct. at 3113–15.

Although decided before *Midcal*, the *Cantor* Court, in essence, found that there was no clearly articulated and affirmatively expressed state policy that encompassed the light bulb giveaway program. That is not the case here. A Pennsylvania state statute expressly provides for rebate and load management programs and authorizes the PUC to evaluate the prudence and cost-effectiveness of such programs. Moreover, the PUC has actually considered the anti-competitive impact of such programs, and there is unrebutted evidence that other Pennsylvania electric utilities have programs similar to PP & L's. *See 1991 BCE & EP Report* at 45–130. I therefore conclude that *Cantor* is distinguishable from the facts of the instant case and does not compel a different result.[18]

### B. *Active State Supervision*

■ The most recent Supreme Court decision considering *Midcal*'s second prong, active state supervision, is *Federal Trade Comm'n v. Ticor Title Ins. Co.*, —— U.S. ——, 112 S.Ct. 2169, 119 L.Ed.2d 410 ("*Ticor II*"), in which the Court reversed the Third Circuit's active state supervision analysis in the *Ticor* decision discussed above. Recall that *Ticor* involved collective rate setting in several states by title insurers. The Third Circuit held that the active state supervision requirement was met as to Montana and Wisconsin because insurance commissions in those states (1) had a rate supervision program in place, (2) had authority to regulate the rates, (3) were required to reject the rates following a hearing, and (4) had not rejected the rates. *Ticor*, 922 F.2d at 1141. The Supreme Court's reversal was based upon findings made by an administrative law judge that rates in those states simply became effective unless rejected within some period of time, that the rate filings were at most checked for mathematical accuracy, and that there was no other evidence of the states having actually supervised title insurer rate-setting. *Ticor II*, —— U.S. at ——, 112 S.Ct. at 2179.

The Court's focus upon the lack of actual supervision provided by the states reflects its exploration into the nature of the active

---

**18.** I also note that the teachings of *Cantor* have been called into question by *Midcal*'s progeny. *See, e.g., Southern Motor Rate Carriers*, 471 U.S. at 57 n. 21, 105 S.Ct. at 1727 n. 21 (criticizing "questionable dictum" of *Cantor*). Also consider the Court's rejection in *Southern Motor Carriers* of the *Cantor* notion that *Parker* does not immunize private conduct from antitrust liability. *Compare Southern Motor Carriers*, 471 U.S. at 61, 105 S.Ct. at 1729 *with Cantor*, 428 U.S. at 590–92, 96 S.Ct. at 3117–18. *See also Metro Mobile CTS Inc. v. Newvector Communications, Inc.*, 661 F.Supp. 1504, 1513 (D.Ariz.1987), *aff'd*, 892 F.2d 62 (1989) (exploring questionable holdings of *Cantor*).

state supervision requirement. Referring back to its initial elaboration of the requirement in *Patrick v. Burget*, 486 U.S. 94, 108 S.Ct. 1658, 100 L.Ed.2d 83 (1988), the Court explained that the " 'requirement is designed to ensure that the state-action doctrine will shelter only the particular anti-competitive acts of private parties that, in the judgment of the State, actually further state regulatory policies.' " *Ticor II*, —— U.S. at ——, 112 S.Ct. at 2177 (quoting *Burget*, 486 U.S. at 100–101, 108 S.Ct. at 1662–63). The Court then elaborated that "the analysis asks whether the state has played a substantial role in determining the specifics of the economic policy. The question is not how well state regulation works but whether the anti-competitive scheme is the State's own." *Id.*

After reviewing the underpinnings, the Court turned to the showing necessary to satisfy the active state supervision requirement. First, the Court addressed the standard employed by the Third Circuit, which asked whether a state supervisory program was in place, adequately funded, and adequately empowered to regulate the standards of the state policy. *Id.* at ——, 112 S.Ct. at 2179. Finding this standard to be a good start but insufficient in itself, the Court added the following:

> Where prices or rates are set as an initial matter by private parties, subject only to a veto if the State chooses to exercise it, the party claiming the immunity must show that state officials have undertaken the necessary steps to determine the specifics of the price-fixing or ratesetting scheme. The mere potential for state supervision is not an adequate substitute for a decision by the State.

*Id.* Thus, the Court held that to satisfy the active state supervision requirement, a defendant must show (1) the existence of a state regulatory program with authority to regulate the conduct complained of pursuant to standards of the state policy, and (2) actual use of that authority. Against this standard and the Court's explanation of the requirement, I will consider Pennsylvania's supervision of PP & L's programs.

As mentioned above, the Pennsylvania legislature has invested the PUC with "full power and authority ... to enforce, execute and carry out, by its regulations, orders, or otherwise, all and singular, the provisions of [the Code] and the full intent thereof." 66 Pa.Cons.Stat.Ann. § 501(a) (Purdon 1979). With respect to tariffs such as the RTS Rate, the Pennsylvania legislature has given the PUC authority to determine, after a hearing, whether tariff rates are "unjust or unreasonable, or in anywise in violation of law." *See* 66 Pa. Cons.Stat.Ann. § 1308(c) (Purdon 1979); 66 Pa.Cons.Stat.Ann. § 1309(a) (Purdon Supp. 1992). As to load management programs such as the rebate and RTS Rate, the Pennsylvania legislature has entrusted the PUC with authority to determine their prudence and cost-effectiveness. *See* 66 Pa.Cons. Stat.Ann. § 1319(a) (Purdon Supp.1992). I therefore conclude that the PUC has ample authority to regulate the PP & L programs at issue here pursuant to the standards of Pennsylvania's load management policy.

I also conclude that through adjudications, rulemakings and investigations, the PUC has exercised this pervasive authority.[19] In 1982, for example, the PUC specifically approved PP & L's RTS Rate after a hearing in a contested tariff proceeding, describing the RTS Rate as having "load management capability." *Pennsylvania Pub. Util. Comm'n v. Pennsylvania Power & Light Co.*, 55 P.U.R.4th 185, 239, 250 (1983). *See also Pennsylvania Pub. Util. Comm'n v. Pennsylvania Power & Light*

19. Authority for the PUC to adjudicate complaints against public utilities within its jurisdiction flows from 66 Pa.Cons.Stat.Ann. § 701 (Purdon 1979). PUC regulations for the handling of informal complaints appear at 56 Pa. Code § 56.161 *et seq.;* the procedure for handling formal complaints is set forth at 56 Pa.

Code. § 5.21 *et seq.* The Commonwealth Court of Pennsylvania has recognized the authority of the PUC to adjudicate complaints against public utilities within its jurisdiction of alleged anti-competitive conduct. *See Executone of Philadelphia, Inc. v. Pennsylvania Pub. Util. Comm'n*, 52 Pa.Commw. 74, 415 A.2d 445 (1980).

*Co.,* 67 P.U.R.4th 30, 90 (1985) (approving increase to the RTS Rate in contested rate proceeding).

In 1984, the PUC promulgated regulations that set forth in very specific detail the methodology to be used in assessing the cost effectiveness of load management programs and assuring that such programs and their associated costs are just and reasonable. 14 Pa.Bull. 4514 (Dec. 15, 1984); 52 Pa.Code § 69.121 *et seq.* These regulations require that all Pennsylvania electric utilities analyze their load management programs pursuant to this methodology and report the results of their analysis to the PUC each year. *See id.* Since that time, PP & L has analyzed its rebate and RTS Rate programs and reported the results to the PUC pursuant to these regulations. *See* Pennsylvania Power & Light Company, *Annual Conservation and Load Management Reports* 1985–1990.

In 1989, the BCE & EP directly considered the cost effectiveness of PP & L's programs while investigating complaints of the Pennsylvania Petroleum Association (representing home heating oil distributors) and state legislators regarding alleged anticompetitive effects of the very PP & L programs that are the subject of this lawsuit. The BCE & EP concluded from its investigation that the programs are "cost effective," "have no adverse impact on nonparticipants," and are "legitimate load management program[s]." *1989 BCE & EP Report.* In reaching these conclusions, the BCE & EP stated that it was acting "on behalf of *the Commission* [PUC]" to "*actively monitor the promotional activities of jurisdictional electric and gas utilities.*" *Id.* at 7 (emphasis in original).

Finally, in 1991, the PUC addressed the potential anti-competitive impact of utility promotional programs and went on to propose regulations clarifying the types of programs that the PUC considers to be in furtherance of Pennsylvania's load management policy and those that do not. 21 Pa.Bull. at 1840–45. These proposed regulations make clear that "utilities may offer rebates and other incentives to encourage demand management programs." 21 Pa. Bull. at 1842.[20]

PP & L has demonstrated adequately Pennsylvania's active supervision of the programs at issue. The PUC has sufficient authority to supervise these programs and has gone well beyond the insurance commissions in *Ticor* in exercising that authority: The RTS Rate was specifically approved after two separate hearings, detailed methodologies have been developed and promulgated to evaluate the cost-effectiveness of such programs, the programs were assessed according to these methodologies and found to further Pennsylvania's load management policy, and new regulations are being developed to provide additional clarification on what type of programs further Pennsylvania's load management policy. This is ample evidence that Pennsylvania has "played a substantial role in determining the specifics of" PP & L's programs. *Ticor II,* —— U.S. at ——, 112 S.Ct. at 2177.[21]

Plaintiffs seek to make much of the fact that only the BCE & EP has expressly recognized the cost-effectiveness of the rebate program, not the full PUC.[22] I do not share their concern. The BCE & EP is a bureau of the PUC charged by the Pennsylvania legislature with studying and re-

**20.** As of this date, there is no indication that the PUC has formally adopted these regulations.

**21.** I note in passing "the close relationship between *Midcal*'s two elements," identified by the Supreme Court in *Ticor II,* —— U.S. at ——, 112 S.Ct. at 2178. In this case, the first prong *Midcal* determination of whether Pennsylvania's load management policy contemplates programs such as PP & L's required consideration of the PUC's views on the relationship of those

programs to the state policy. Under the second prong, the PUC's views on this relationship must be referred to again to determine whether the programs have been actively supervised.

**22.** Plaintiffs' argument rests upon 52 Pa.Code § 1.96, which states that the opinion of employees and representatives of the PUC are only considered as aids to the public and do not have the force and effect of law.

searching all matters within the PUC's jurisdiction and advising the PUC on its findings. 66 Pa.Cons.Stat.Ann. § 308(c). In the *1989 BCE & EP Report*, the bureau states that it "has accepted ... an ongoing assignment in its mandates by Act 216 of the Pennsylvania Legislature" to "'maintain a continuing surveillance of the utilities' promotional activities' and [to] take appropriate action when warranted." *1989 BCE & EP Report* at 6. In assessing PP & L's programs in that report, the BCE & EP was acting "on behalf of" the PUC to supervise utility promotional activities, applying the PUC's formally promulgated evaluation methodology. The PUC has neither overruled nor disagreed with the BCE & EP's conclusions in this regard.

The totality of the evidence shows that the PUC has devised a detailed scheme for the evaluation and supervision of electric utility load management programs such as PP & L's, is sensitive to potential anti-competitive impacts, is continually refining this scheme to make clearer programs that further the state policy, and relies, at least initially, upon the BCE & EP to supervise such programs. In this light, subjecting PP & L to the possibility of treble damages simply because only a PUC bureau, rather than the PUC commissioners, has found PP & L's programs cost-effective would be contrary to the principles of federalism and state sovereignty upon which *Parker* rests. For purposes of state action immunity, PP & L should be entitled to rely upon the PUC's apparently lawful supervision of these programs through the BCE & EP until the Supreme Court of Pennsylvania makes clear that the PUC cannot regulate such programs in this manner, or until the PUC makes clear that the BCE & EP is not acting on behalf of the PUC for such purposes. *See Ticor,* 922 F.2d at 1133–35. *See also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* § 212.4b (Supp. 1990).

Plaintiffs also contend that there can be no active supervision in this case because they cannot complain to the PUC about PP & L's alleged anti-competitive practices. The Commonwealth Court of Pennsylvania in *Executone of Philadelphia, Inc. v. Pennsylvania Pub. Util. Comm'n,* 52 Pa. Commw. 74, 415 A.2d 445 (1980), however, held differently. The court recognized that customers of a utility may complain to the PUC about the utility's alleged anti-competitive behavior. *Id.* 415 A.2d at 446. As there is uncontroverted evidence that at least 18 plaintiffs in this case are PP & L customers, *see Affidavit of Thomas P. Arnold,* I reject plaintiffs' contention.

In summary, because I find that PP & L has satisfied both prongs of *Midcal,* I conclude that PP & L is immune from antitrust liability in this case under *Parker,* and I will enter judgment in favor of PP & L as to each of plaintiffs' antitrust claims.

## III. RICO

The *Yeager* plaintiffs claim that PP & L's conduct not only violates the federal antitrust laws, but also section 1962(c) of RICO. 18 U.S.C.A. § 1962(c) (West 1984). To state a claim under this section, plaintiffs must allege a "pattern of racketeering activity." *Id. See also Aydin Corp. v. RGB Sales,* No. 89–8084, slip op., 1991 WL 152465 (E.D.Pa. Aug. 5, 1991) (Dubois, J.). A pattern of racketeering activity consists of at least two predicate acts of commission of an offense identified in the list found in 18 U.S.C. § 1961(1) (West 1984). *See Aydin.* Attempting to satisfy this requirement, plaintiffs aver in their amended complaint that PP & L has on at least two occasions violated the Pennsylvania Commercial Bribery statute, 18 Pa.Cons.Stat. Ann. § 4108(a) (Purdon 1983), which states:

> **Corrupt employee, agent or fiduciary.—** An employee, agent or fiduciary commits a misdemeanor of the second degree when, without the consent of his employer or principal, he solicits, accepts, or agrees to accept any benefit from another person upon agreement or understanding that such benefit will influence his conduct in relation to the affairs of his employer or principal.

Plaintiffs aver that PP & L has run afoul of this statute by paying the cash incentives described above "to developers and/or builders and/or contractors who install heat pumps in new residential construction...." *Yeager* Amended Complaint at ¶ 64. For PP & L to have violated this statute, however, the cash incentives must have been paid to an employee, agent or fiduciary of someone from whom consent to accept the payments should have been but was not been obtained. *See Aydin.* Plaintiffs do not aver in their amended complaint that the "developers and/or builders and/or contractors" are employees, agents or fiduciaries of anyone from whom they were required to obtain consent before accepting the payments. Thus, plaintiffs have not sufficiently pled a predicate act under 18 U.S.C.A. § 1961(c); plaintiffs have failed to state a cause of action under RICO, and I will dismiss plaintiffs' RICO count. *See* Fed.R.Civ.P. 12(b)(6); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

## IV. STATE LAW CLAIMS

■ The *Losch* plaintiff claims that PP & L's actions "constitute civil conspiracy and unfair methods of competition, in violation of Pennsylvania law." *Losch* Complaint at ¶ 47. As mentioned earlier, the *Losch* case was filed in April 1992 and almost immediately consolidated with *Yeager* for purposes of the instant motion for summary judgment. Hence, unlike *Yeager, Losch* has not appreciably developed pretrial. With regard to the *Losch* state law claims, which were not briefed as a part of the instant motion, neither the parties nor the Court have expended any significant time or resources to address their merits. Although I understand that some discovery regarding these claims has taken place, I also understand that this discovery relates to documents only, which also bear on the federal claims and which can be easily employed in any ensuing state court proceeding. Having discharged the *Losch* plaintiff's federal antitrust claims, I

will therefore decline to exercise jurisdiction over its state law claims, which will be dismissed without prejudice. *See* 28 U.S.C.A. § 1367(c)(3) (West Supp.1992) ("The district courts may decline to exercise supplemental jurisdiction over a claim ... if the district court has dismissed all claims over which it has original jurisdiction.").

An appropriate Order follows.

## AMENDED ORDER

AND NOW, this 5th day of October, 1992, upon consideration of Defendant's Motion for Summary Judgment, all papers filed in support thereof and in opposition thereto, and oral argument held thereon, IT IS HEREBY ORDERED that:

1. JUDGMENT is entered FOR DEFENDANT and AGAINST all PLAINTIFFS as to all antitrust claims in both *Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.,* No. 91–5176, and *Losch Boiler Sales & Service Co. v. Pennsylvania Power & Light Co.,* No. 92–2359;

2. The RICO claims in *Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.,* No. 91–5176, are DISMISSED;

3. The pendent state law claims in *Losch Boiler Sales & Service Co. v. Pennsylvania Power & Light Co.,* No. 92–2359, are DISMISSED without prejudice as a matter of this Court's discretion pursuant to 28 U.S.C.A. § 1367(c)(3); and

4. The Clerk of the Court shall mark this case CLOSED.