**LEASE LIGHTS, INC.; Jack R. Seay, d/b/a Seay Electric Company; Knight Lights Company, Inc.; and Protective Lighting, Inc., Plaintiffs–Appellees,**

v.

**PUBLIC SERVICE COMPANY OF OKLAHOMA, a corporation, Defendant–Appellant**

**Oklahoma Corporation Commission, Amicus Curiae.**

No. 86–1797.

United States Court of Appeals, Tenth Circuit.

June 27, 1988.

Jack I. Gaither (Bruce D. Gaither with him on the brief), Tulsa, Okl., for plaintiffs–appellees.

Jeffrey H. Howard of Davis, Graham & Stubbs (Floyd L. Walker and James F. Bullock of Pray, Walker, Jackman, Williamson & Marlar, Tulsa, Okl.; and Robert H. Harry, Denver, Colo., with him on the briefs), Washington, D.C., for defendant–appellant.

Lindil Fowler, Gen. Counsel, Oklahoma City, Okl., on the brief, for amicus curiae.

Before LOGAN, MOORE, and BALDOCK, Circuit Judges.

JOHN P. MOORE, Circuit Judge.

The Public Service Company of Oklahoma (PSO) appeals from the jury verdict that it monopolized a sector of the leased outdoor lighting market in Tulsa, Oklahoma. PSO argues its conduct was controlled and supervised by the Oklahoma Corporation Commission (the Commission) until 1985 and may not be the subject of an antitrust action under the state action doctrine. PSO further urges that plaintiffs fail to prove sufficient non-immune conduct to support the claim of attempted monopolization. We hold that the state action doctrine protects those actions by PSO which were actively supervised by the Commission. In addition, we believe plaintiffs have failed to present adequate evidence of non-immune behavior by PSO to show an attempt to illegally monopolize the market for leased outdoor lighting in Tulsa. We therefore reverse the judgment of the district court.

I.

PSO is a public utility engaged in the generation, transmission, and delivery of

electricity in parts of eastern and southwestern Oklahoma.[1] PSO also sells and leases 175 and 400 watt outdoor lights in Tulsa, Oklahoma. The Commission, a state agency, supervises the rates charged by PSO for leasing outdoor lights to the public and for providing electricity to competing light services. In 1975, the Commission ordered PSO both to reduce the rates charged to the public for its outdoor lighting service and to restructure its rate system for providing electricity by replacing the flat annual fee with an outdoor metered rate. As a result, PSO reduced its leasing rates in Tulsa by about four percent (from $4.00 to $3.85 for 175 watt lights), while substantially increasing the rates charged to contractors for electricity used in their competing light services.

Four electrical contractors brought this action in 1977, alleging that this order was the economic equivalent of an "atomic bomb." They claimed PSO sought to drive them out of business in order to monopolize the outdoor lighting market in the Tulsa area. PSO unsuccessfully moved for summary judgment, asserting its challenged conduct was immune from antitrust attack under the state action doctrine. The district court held that the state action immunity doctrine was still developing and no consistent test had emerged. In 1981, the action proceeded to a two-week jury trial during which the court directed a verdict against the plaintiffs for failing to satisfy the jurisdictional requirement of a Sherman Act violation by showing PSO's activities had a substantial impact on interstate commerce. This court reversed, holding that plaintiffs had made a prima facie showing of a sufficient nexus between PSO's actions and interstate commerce. *See Lease Lights v. Public Serv. Co. of Okla.*, 701 F.2d 794 (10th Cir.1983). In a second trial in 1984, the jury awarded plaintiffs trebled damages exceeding $2 million. The court added over $500,000 in attorney fees and costs. PSO appeals from this judgment.

## II.

### A.

PSO's main argument is that its rate changes should be immune from antitrust attack. As first conceived by the Supreme Court in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the state action doctrine allowed state legislatures to formally command that certain areas of commerce be exempt from the provisions of the Sherman Act. The Court subsequently developed the requirement that state legislatures compel the immune behavior. In *Goldfarb v. Virginia State Bar Ass'n*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed. 2d 572 (1975), for example, the Court struck down a minimum fee schedule enforced by the state bar, holding that there existed neither a state law nor a state supreme court decision requiring the establishment of a rigid price floor in the fees attorneys could charge their clients. Similarly, in *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), the Court decided that state regulation of Detroit Edison's distribution of electricity did not confer state action immunity on its anticompetitive actions in the market for the sale of light bulbs. State regulation alone, according to the Court, was insufficient to show that a party's anticompetitive conduct is being commanded by the state government. As in *Goldfarb*, the Court in *Cantor* required a state to compel, rather than merely prompt or allow, anticompetitive conduct for state action immunity to be conferred.

██ Plaintiffs now urge us to adhere to the compulsion requirement set forth in these decisions. They ignore, however, that the Supreme Court has explicitly softened the previously stringent requirements for state action immunity. In *Southern Motor Carriers Rate Conference v. United States*, 471 U.S. 48, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985), the United States challenged a joint ratemaking procedure used by three motor carrier rate bureaus, argu-

---

**1.** Electric power is also provided in Oklahoma by three other investor-owned utilities and by 31 rural electrical cooperatives.

ing that the procedure could not be immune under the state action doctrine because it was not compelled by the four states in which the bureaus operated. The Court refused to adhere to the compulsion requirement. While compulsion by the state is the best evidence of a state policy to displace competition, according to the Court, immunity is justified if a state merely *permits* the conduct to occur. This test is satisfied by showing 1) the challenged behavior is sanctioned by a clearly articulated and affirmatively expressed state policy, and 2) the state actively supervises the private anticompetitive conduct at issue. 471 U.S. at 57, 105 S.Ct. at 1726 (citing *California Retail Liquor Dealers Ass'n v. Midcal Aluminum*, 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980)). The first element of the test does not require legislation explicitly authorizing the challenged conduct, but only an indication by the state that it intends to displace competition with regulation in the particular area of commerce. *Id.* at 64, 105 S.Ct. at 1730.

The Court held the rate bureaus met these requirements. Both parties agreed that the regulatory agencies in the four states actively supervised the collective ratemaking activities. Furthermore, three of the four states had statutes permitting collective ratemaking by common carriers. The fourth state, Mississippi, gave the regulatory agency authority to regulate common carriers by granting it the power to prescribe "just and reasonable rates" for the intrastate transportation of general commodities. This language, the Court stated, expressed the legislature's intent that intrastate trucking rates be determined by a regulatory agency, rather than by the market. Therefore, plaintiffs' collective ratemaking in each of the four states was protected by state action immunity.

The test employed in *Southern Motor Carriers* to replace the compulsion require-

ment has received consistent recognition by the Court as the proper standard to determine the applicability of state action immunity.[2] Indeed, on every occasion that the Court has considered state action immunity during the past three years, it has invoked the *Southern Motor Carriers* test rather than the compulsion test. *See, e.g., 324 Liquor Corp. v. Duffy*, 479 U.S. 335, 107 S.Ct. 720, 93 L.Ed.2d 667 (1987) (New York's liquor pricing system does not fall within state action exemption to antitrust laws because the statute, even though "clearly articulated and affirmatively expressed as state policy," does not provide for active supervision by the state). Recently, for example, the Court held that the state action doctrine did not protect Oregon physicians from antitrust liability for their activities on hospital peer-review committees because state officials did not have the power to review the findings of these committees, and therefore the "active supervision" prong of the *Southern Motor Carriers* test was not satisfied. *See Patrick v. Burget*, — U.S. —, 108 S.Ct. 1658, 100 L.Ed.2d 83 (1988).

■ We have dwelled on *Southern Motor Carriers* and its progeny because these decisions are dispositive of the instant case. First, we believe there exists a clearly articulated state policy to regulate the market for leased outdoor lights. The Oklahoma Constitution gives the Commission the power to regulate public utilities, which it defines as "all gas, electric, heat, *light*, and power companies...." Okla. Const. art. IX, § 34 (emphasis added). Pursuant to this authority, the legislature has given the Commission general supervision over all public utilities that supply "the production, transmission, delivery, or furnishing of heat *or light* with gas [and the] ... electric current for *light*, heat or power." *See* Okla.Stat.tit. 17, § 151 (1981) (emphasis added).

---

**2.** While the Court first articulated the test in the *Midcal Aluminum* decision, it also approved the compulsion requirement in that case. Needless to say, after *Midcal Aluminum* the federal courts were in complete confusion regarding which test to adopt. In *Southern Motor Carri-* ers, the Court for the first time clearly rejected the compulsion requirement. *See* Comment, *Private Parties and State Action Immunity to the Sherman Anti-Trust Act After Southern Motor Carriers Rate Conference*, 24 Houston L.Rev. 311, 333 (1987).

Within this domain, the Commission has the power to prescribe "rules, requirements and regulations, affecting [the utilities'] services, operation, and the management and conduct of their business." Okla. Stat. tit. 17, § 152. The Commission also establishes and enforces rates "as may be reasonable and just." Okla. Const. art. IX, § 18. The constitution states that the authority of the Commission to prescribe these rates is paramount; rates which are inconsistent with the Commission's rates "shall be unlawful and void." *Id.* To carry out this mandate, the Commission may exercise "full visitorial and inquisitorial power to examine ... public utilities...." Okla.Stat. tit. 17, § 152. Furthermore, the Commission must periodically conduct detailed rate investigations and continually oversee public utilities' compliance with rate schedules which include fuel adjustment clauses. Okla.Stat. tit. 17, §§ 252, 263. We hold that these constitutional and statutory provisions indicate a clear intent by the state to supplant the market for leased outdoor lighting with active regulation by the Commission.

We also believe the Commission has used this grant of authority to closely supervise the outdoor lighting services provided by public utilities, including PSO. The Commission has regulated the outdoor lighting market in Oklahoma for twenty years. It currently imposes a thorough set of guidelines upon the lighting services of thirty-three public utilities operating within Oklahoma. Moreover, the Commission until 1985 closely regulated the rates charged by PSO for its outdoor lighting services. From 1977 to 1985, PSO submitted monthly reports to the Commission of its compliance with the fuel adjustment clause in its outdoor lighting rates. When PSO applied to reduce its Tulsa lighting charge from $4.00 to $3.95 a month for a 175 watt light (while raising the cost of its service in rural areas), the Commission conducted three days of public hearings involving extensive testimony and over 100 exhibits. After considering the evidence, the Commission reject-

ed PSO's request and chose instead to reduce PSO's rate to $3.85. Thus, the lower rate charged by PSO for its outdoor lighting service in Tulsa, which plaintiffs claim destroyed their business, was compelled by an independent decision of the Commission that PSO could not disobey.

### B.

Plaintiffs emphasize that the Oklahoma Supreme Court overturned the Commission's outdoor lighting rates in December 1983, finding that PSO's lighting business "is not used or useful to the ratepayers as a whole, and thus its investment may not be included in its general rate base." *Public Serv. Co. of Okla. v. Oklahoma Corp. Comm'n*, 688 P.2d 1274, 1281 (Okla.1983) (*PSO*).[3] We hold that this decision did not alter PSO's responsibility to comply with rates mandated by the Commission before 1984. The constitutional invalidity of the attempted state regulation is not an appropriate basis for disregarding state action immunity. *E.g., Llewellyn v. Crothers,* 765 F.2d 769, 774 (9th Cir.1985). Rather, there should be a defense for those reasonably relying on the appearance of legality when a state agency's exercise of power is unauthorized. *See* P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 212.4b, at 132 (Supp.1987). To rule otherwise would require regulated industries to seek judicial review of every order of a regulatory agency to ensure that compliance does not later subject them to antitrust liability.

In this case, neither the Commission nor PSO had any reason to anticipate that outdoor lighting rates could not be included in PSO's rate base. Until the 1984 decision, the Oklahoma Supreme Court had never overturned a decision by the Commission involving the outdoor lighting of a regulated utility. Indeed, the court affirmed the 1975 "atomic bomb" order challenged in the instant case in *Chickasha Cotton Oil Co. v. Oklahoma Corp. Comm'n,* 562 P.2d 507 (Okla.), *cert. denied,* 434 U.S. 829, 98 S.Ct. 110, 54 L.Ed.2d 88 (1977). The court

---

**3.** As a result of this decision, the Commission decontrolled the rates for PSO's outdoor lighting

service in April 1985.

also stated one year before *PSO*, "[t]he duty of the Commission to supervise, regulate and control the charges and rates of public utilities is constitutionally mandated." *Cartwright v. Southwestern Bell Tel. Co.*, 662 P.2d 675, 679 (Okla.1983).[4]

For these reasons, we conclude that PSO's rate changes meet the test for state action immunity set forth in *Southern Motor Carriers*. Indeed, PSO's case for immunity is even stronger than the arguments successfully espoused in *Southern Motor Carriers*, since in that case, regulatory agencies merely allowed the challenged collective ratemaking by trucking companies. Individual common carriers remained free to submit individual rate proposals to the Public Service Commissions. 471 U.S. at 52, 105 S.Ct. at 1724. In the instant case, however, the Commission compelled the challenged conduct by rejecting PSO's requested rates and establishing its own price after extensive, formal hearings were held. As mentioned, the Court held in *Southern Motor Carriers* that compulsion is the best evidence of a state policy to displace competition. 471 U.S. at 62, 105 S.Ct. at 1729. Therefore, we hold that PSO's actions pursuant to the Commission's rate orders are immune from antitrust attack under the state action doctrine.[5]

### III.

■ The remaining issue is whether plaintiffs proved sufficient non-immune conduct to support the verdict. To prove attempted monopolization, plaintiffs must show: 1) a relevant market in which the alleged attempt occurred; 2) a dangerous probability of success in monopolizing the relevant market; 3) a specific intent to monopolize; and 4) conduct in furtherance of such an attempt. *Shoppin' Bag of Pueblo v. Dillon Cos.*, 783 F.2d 159, 161 (10th Cir.1986). Once immunity is recognized, PSO argues, it should be shielded from all complaints regarding the rate changes resulting from the 1975 order and from any other conduct which was mandated by the Commission. PSO believes that once the immune conduct is extirpated from plaintiffs' prima facie case, nothing remains of plaintiffs' contentions from which a reasonable jury could find predatory conduct satisfying the latter three elements of attempted monopolization.

■ We agree. Plaintiffs complain of a series of rate changes by PSO for its outdoor lighting service from 1973 to 1983, including the 1975 "atomic bomb" rate order. Yet each of these rate orders are immune under the state action doctrine because the Commission consistently established and supervised the rates charged by PSO during this period.

Several of plaintiffs' remaining allegations also concern conduct that is immune under the state action doctrine. For example, plaintiffs argue that PSO has an unfair advantage because, unlike private contractors, it is authorized by state and local authorities to install lighting without a state or municipal license. However, PSO did not cause these regulations to be adopted and is immune from attack based

---

**4.** Furthermore, the 1984 decision may reasonably be interpreted as only requiring evidence that outdoor lighting is useful to the ratepayers, rather than as a limit on the Commission's jurisdiction to regulate the outdoor lighting market. Based on this interpretation, the Commission reconfirmed in December 1985 that the outdoor lighting provided by PSO's neighboring utility, Oklahoma Gas and Electric Company, should continue to be regulated. The Commission distinguished the *PSO* case on the ground that Oklahoma Gas and Electric's outdoor security lighting earned a "higher than system average rate of return" and was not subsidized by the other service classes. *See In the Matter of the Application of Oklahoma Gas and Electric Company,* OCC Cause No. 29450, Order No. 290658,

p.10 (Dec. 20, 1985). We note that the interpretation of the public utility laws by the expert agency charged with enforcement of these laws should be given persuasive weight. *E.g., Gambrel v. Kentucky Bd. of Dentistry,* 689 F.2d 612 (6th Cir.1982), *cert. denied,* 459 U.S. 1208, 103 S.Ct. 1198, 75 L.Ed.2d 441 (1983).

**5.** PSO also believes it is insulated from liability by the *Noerr–Pennington* doctrine, which precludes application of the Sherman Act to an entity's efforts to obtain favorable treatment from the government, even if its goals are anticompetitive. Given our holding on PSO's state action immunity claim, we need not address this issue.

on the licensing requirements of state and local law, since these regulations are clearly articulated and actively supervised by the government.

For the same reason, plaintiffs' complaint that PSO refused to allow them to attach their lights to PSO's poles without a permit is untenable. Franchise agreements require plaintiffs to have a municipal permit before using PSO's poles; they expressly declare that PSO is "authorized to allow others *having a permitted right* granted by the City of Tulsa to attach facilities to its poles and structures." (Emphasis added.) Again, there is no evidence that these regulations are a sham or that city franchise agreements should not be immune from attack under the antitrust laws. *See Rural Elec. Co. v. Cheyenne Light, Fuel & Power Co.*, 762 F.2d 847 (10th Cir.1985) (requirements in city franchise agreement are immune from challenge under the state action doctrine).

Plaintiffs' final claim is that PSO unreasonably delayed hooking up their lights. While this alleged behavior is not immune under the state action doctrine, we believe plaintiffs have failed to show the delay resulted from a policy of discrimination. The only testimony on this issue was from a customer of plaintiffs who attributed the delay in the hookup of his light to the need to install an intermediate pole to bridge the distance between the existing electrical service and his light. Furthermore, PSO only had three work crews to serve 71,000 customers, and hooking up new commercial installations was a lower priority than restoring interrupted service or servicing new residential customers. We believe, therefore, there is no evidence that hookups for PSO's outdoor lighting customers received priority over hookups for other outdoor lighting installations. We hold that plaintiffs have failed to show either a

specific intent to monopolize or nonimmune conduct in furtherance of the attempted monopolization.[6] Accordingly, the district court's judgment is REVERSED.

---

6. Because of our holding, we need not address whether plaintiffs satisfied the first two elements of attempted monopolization. We note, though, that to satisfy the second element, plaintiffs must show there existed a dangerous probability of PSO succeeding in monopolizing the relevant market by proving it had the ability to control prices and exclude competition. *E.g., Shoppin' Bag of Pueblo*, 783 F.2d at 164. This

would have been a very difficult task, given the fact that the Commission dictated to PSO both the price it could charge for leasing outdoor lights and the electricity rates it could levy on competing contractors. *Cf. Bright v. Moss Ambulance Serv.*, 824 F.2d 819, 824 (10th Cir.1987) (activity which is protected by state action immunity may not be the basis for allegations of improper market power).