YEAGER'S FUEL, INC.; Atlantic Oil and Heating Company; Mansfeld Fuel Oil Company; Deiter Brothers Fuel Company, Inc.; Ralph D. Weaver, Inc.; C.A. Lessig, Inc.; Harned Durham Oil Company, Inc.; Schwanger Brothers & Com-

pany, Inc.; SICO Company; Withlock & Woerth, Inc.; Zongora Fuel, Inc.; Senick, Inc.; Carlos R. Leffler, Inc.; H. John Davis, Inc.; Arthur J. Ulrich, Inc.; Union Fuel Company; Guy Heavener, Inc.; Desousa Oil and Service Corp.; W.C. Reichenbach & Sons, Inc.; Apgar Oil Company, Inc.; Freyman's Fuel Oil Company, Inc.

v.

### PENNSYLVANIA POWER & LIGHT COMPANY.

### LOSCH BOILER SALES AND SERVICE CO., Individually and on Behalf of All Persons Similarly Situated

v.

### PENNSYLVANIA POWER & LIGHT CO.,

Yeager's Fuel, Inc.; Atlantic Oil and Heating Company; Mansfeld Fuel Oil Company; Deiter Brothers Fuel Company, Inc.; Ralph D. Weaver, Inc.; C.A. Lessig, Inc.; Harned Durham Oil Company; Schwanger Brothers and Company, Inc.; SICO Company; Whitlock & Woerth, Inc.; Zongora Fuel, Inc.; Senick, Inc.; Carlos R. Leffler, Inc.; H. John Davis, Inc.; Arthur J. Ulrich, Inc.; Union Fuel Company; Guy Heavener, Inc.; Desousa Oil and Service Corp.; W.C. Reichenbach & Sons, Inc.; Apgar Oil Company, Inc.; and Freyman's Fuel Oil Company, Inc.; and Losch Boiler Sales & Service Co., individually and on behalf of all persons similarly situated, Appellants.

### No. 93–1098.

United States Court of Appeals, Third Circuit.

Argued July 21, 1993.

Decided April 26, 1994.

Sur Petition for Rehearing June 6, 1994.

---

[*] Honorable Jane A. Restani, Judge of the United States Court of International Trade, sitting by designation.

David L. Pennington, Catherine P. Cox, Harvey, Pennington, Herting & Renneisen, Philadelphia, PA, for appellants.

Wayne M. Thomas (argued), Kohn, Nast & Graf, Philadelphia, PA, for appellant, Losch Boiler Sales & Service Co.

Christopher C. Fennell, Jeffrey H. Howard (argued), Crowell & Moring, Washington, DC, for appellee.

Thomas L. Welch, Office of Atty. Gen., Harrisburg, PA, for amicus-appellant, Com. of Pennsylvania.

Before: MANSMANN, GREENBERG and LEWIS, Circuit Judges.

## OPINION OF THE COURT

LEWIS, Circuit Judge.

This appeal involves two related cases that were consolidated for summary judgment

disposition in the district court. In the first case, *Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.*, 21 oil dealers and persons who supply related heating equipment sued Pennsylvania Power & Light Co. ("PP & L") alleging violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2; section 2(c) of the Robinson–Patman Act, 15 U.S.C. § 13(c); section 3 of the Clayton Act, 15 U.S.C. § 14; and section 1962(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c). In the second case, *Losch Boiler Sales & Service Co. v. PP & L*, a fuel oil company which supplies and installs heating equipment brought a class action lawsuit against PP & L alleging violations of sections 1 and 2 of the Sherman Act; sections 2 and 3 of the Robinson–Patman Act, 15 U.S.C. §§ 13, 13a; section 3 of the Clayton Act; and state law claims of unfair competition and civil conspiracy.

We agree with the district court that PP & L is immune from antitrust liability for offering builders and developers cash grants and other incentives, and for offering consumers a special electric rate for installation of high-efficiency electric heating systems. However, we also conclude that PP & L is not immune from antitrust liability to the extent it made these offers contingent upon "all-electric development agreements." Therefore, we will affirm the judgment of the district court except as to the plaintiffs' allegations that PP & L provided benefits to builders and developers in exchange for entry into all-electric development agreements. As to those allegations, we will reverse and remand so that the case may proceed to trial on both those claims and the *Losch* plaintiffs' state-law claims.

## I.

Defendant/appellee PP & L is an electric utility servicing Allentown, Pennsylvania, and surrounding areas. In addition to providing the Allentown area with electricity, PP & L competes with the plaintiffs (the "Oil Dealers") and others for customers in the residential heating market in Allentown and surrounding areas. Because of the costs associated with converting from one type of home heating system to another, the most intense competition is in the new construction market. *See Losch* complaint ("*Losch*") ¶ 22, appendix ("app.") at 1040.

According to the Oil Dealers' complaints, PP & L began promoting the use of electric heat pumps as conservation devices for use in new homes in the late 1970s. *Yeager's* amended complaint ("*Yeager's*") ¶ 26, app. at 9. To encourage builders and developers to use electric heat pumps, PP & L offered them cash incentives for each new home in which an electric heat pump was installed. *Yeager's* ¶¶ 28–29, app. at 10; *Losch* ¶ 15, app. at 1038; *see* app. at 1265–66, 4184–85. PP & L also provided builders and developers with other benefits by, for example, subsidizing developers' advertising efforts and paying for the installation of high-efficiency electric heat in model homes. *See, e.g.,* app. at 4173, 4176. Although not specifically alleged in the Oil Dealers' complaints, PP & L apparently included in some of its incentive offers provisions such as the following:

> Developer must agree that the entire development will consist of only electrically heated units during the term of this Agreement. Completion of a non-electrically heated unit shall void this Agreement and the System grants for future units in the development will revert to whatever applicable program, if any, is in effect at the time.

App. at 1265. *See Yeager's* ¶ 29, app. at 10. *See also* app. at 4177, 4185. (We will refer to agreements containing clauses such as this as "all-electric development agreements.")[1]

---

1. Significantly, these agreements require only that all units in the development use electric heat, not that they utilize high-efficiency electric heating systems. Thus, while a builder or developer would not receive a grant for a home using less efficient electric baseboard heating, it would not lose potential grants for other homes in the development by building such a home. Through these agreements then, PP & L made a unit containing inefficient electric baseboard heating preferable to a unit using efficient gas or oil heating systems. The agreements would assist in efforts to "block the entry of fossil fuels, especially gas, into new developments." App. at 1624; *see also* app. at 4156.

PP & L also offered reduced electric rates for a limited time to persons purchasing "Four–Star" homes equipped with electric heat pumps and residential off-peak thermal heating ("RTS") systems.[2] *Yeager's* ¶ 31, app. at 11; *Losch* ¶¶ 18–19, app. at 1038–39. RTS systems promote load management[3] by heating water during off-peak hours (times during which the demand for electricity is at the lowest) and storing it for use during peak hours (times of highest demand). PP & L offered a special rate (the "RTS Rate") to homeowners purchasing homes with these units because RTS systems are more expensive than electric baseboard heating.

The Oil Dealers allege that PP & L approached builders and developers about these programs and incentives shortly after receiving requests from them to provide electricity during construction. *Losch* ¶ 15, app. at 1038. Thus, the Oil Dealers contend that PP & L is using its status as the sole provider of electricity in the Allentown area to monopolize the home heating market in that area. *Losch* ¶ 25, app. at 1042. As support for this allegation, they allege that more than 70 percent of new homes constructed in the Allentown area since the early 1980s use electric heat rather than oil or other heating systems. *Yeager's* ¶ 32, app. at 11; *Losch* ¶ 20, app. at 1039.[4]

PP & L responded to the Oil Dealers' allegations in part by claiming that it was immune from antitrust liability for the challenged activities under the state action immunity doctrine. *See Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). The district court agreed with PP & L and dismissed the Oil Dealers' antitrust claims on this basis.[5] The Oil Dealers appeal.

## II.

We need only address PP & L's state action immunity argument with respect to the RTS Rate and incentive programs which were not offered as part of all-electric development agreements, for PP & L has conceded both in its brief and at oral argument that it does not seek state action immunity for benefits provided to builders and developers pursuant to all-electric development agreements. *See* PP & L's brief at 41. Instead, PP & L asks us to affirm the district court's grant of summary judgment as to the alleged all-electric development agreements on the merits without resort to the immunity defense. We will first address the state action immunity issue and then turn to PP & L's arguments regarding the all-electric development agreements.

■ The district court had jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1337 and 15 U.S.C. §§ 15, 26. We exercise jurisdiction pursuant to 28 U.S.C. § 1291. Our review of a grant of summary judgment is plenary; we evaluate the evidence using the same standard the district court was to

2. It is unclear whether, as alleged in the complaints, a home had to use a high-efficiency heat pump to be designated as a Four–Star home. From the record, it appears that to qualify as a Four–Star home, and thus to receive the reduced rate, a home had to contain an RTS system and energy-efficient appliances. *See* app. at 1288–89, 3967.

3. Load management is the practice of shifting energy demand, or "load," from peak daytime hours (during which there is usually the most demand) to nighttime (off-peak) hours. App. at 172. By shifting the demand on their generation facilities to off-peak times, electric companies can avoid having to increase their generating capacity to serve all their customers.

4. In their brief on appeal, the Oil Dealers also challenge a fourth PP & L practice—a fossil fuel conversion program pursuant to which PP & L offers cash grants to contractors and home-

owners if they replace fossil fuel heating systems with electric heating systems. While the record contains documents to support this allegation, neither the district court's opinion nor either complaint refers to this practice. *See Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.*, 804 F.Supp. 700, 702–03 (E.D.Pa.1992). Because the complaints do not challenge activity other than that associated with new home construction, we will not consider the Oil Dealers' challenge to the alleged conversion program.

5. The court also dismissed the *Yeager's* plaintiffs' RICO claim for failure to state a claim and the *Losch* state-law claims pursuant to 28 U.S.C. § 1367(c)(3) because no federal-law claims remained in the case. The Oil Dealers do not challenge the district court's disposition of the RICO claim on appeal; our disposition of the antitrust claims will result in reversal of the district court's dismissal of the state-law claims in *Losch*.

have applied in reaching its decision. *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1362 (3d Cir.1992). In this case in particular, we exercise plenary review in any event because the state action immunity issue is a question of law. *Ticor Title Insurance Co. v. FTC*, 922 F.2d 1122, 1129 (3d Cir.1991) (*Ticor I*), *rev'd on other grounds*, — U.S. —, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992) (*Ticor II*) *on remand*, 998 F.2d 1129 (3d Cir.1993) (*Ticor III*), *cert. denied*, — U.S. —, —, 114 S.Ct. 1292, —, 127 L.Ed.2d 646 (1994).[6]

■ In *Parker*, the Supreme Court refused to impose antitrust liability for state action because "nothing in the language of the Sherman Act or its history ... suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature." *Parker*, 317 U.S. at 350–51, 63 S.Ct. at 313.[7] Since then, state action immunity from antitrust liability—"the doctrine that federal antitrust laws are subject to supersession by state regulatory programs"—has evolved based upon "[t]he principle of freedom of action for the States, adopted to foster and preserve the federal system." *Ticor II*, — U.S. at —, 112 S.Ct. at 2176. Nevertheless, principles of federalism do not justify a broad interpretation of state action immunity; instead, such an interpretation is disfavored. *Ticor II*, — U.S. at —, 112 S.Ct. at 2178.

■ Although *Parker* did not involve private conduct, subsequent caselaw has made it clear that private entities may claim state action immunity if their challenged activity

was directed and supervised by the state. *E.g., Ticor II*, — U.S. —, 112 S.Ct. 2169; *Patrick v. Burget*, 486 U.S. 94, 108 S.Ct. 1658, 100 L.Ed.2d 83 (1988); *Southern Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985). "Private party conduct is immune from antitrust liability under the state action doctrine only if the party claiming immunity shows that its conduct satisfies two requirements." *Nugget Hydroelectric, L.P. v. Pacific Gas & Electric Co.*, 981 F.2d 429, 434 (9th Cir.1992). *See California Retail Liquor Dealers Assoc. v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980). "A state law or regulatory scheme cannot be the basis for antitrust immunity unless, first, the State has articulated a clear and affirmative policy to allow the anticompetitive conduct, and second, the State provides active supervision of anticompetitive conduct undertaken by private actors." *Ticor II*, — U.S. at —, 112 S.Ct. at 2175. There is a close relationship between the two requirements: "Both are directed at ensuring that particular anticompetitive mechanisms operate because of a deliberate and intended state policy." *Id.* — U.S. at —, 112 S.Ct. at 2178.

### A.

■ As a preliminary matter, we must decide whether state action immunity can shield electric utilities from antitrust liability. The Oil Dealers contend that to grant PP & L state action immunity based upon Pennsylvania's statutory scheme would be inconsistent with the Public Utility Regulatory Poli-

---

6. All citations to *Ticor I* will be to portions which were not reversed by the Supreme Court.

7. The Supreme Court in *Parker* thus first articulated the state action immunity doctrine after consulting the text and history of the Sherman Act. *Parker v. Brown*, 317 U.S. 341, 351–52, 63 S.Ct. 307, 313–14, 87 L.Ed. 315 (1943). Since *Parker*, however, when applying the state action immunity doctrine, courts and commentators have not distinguished between antitrust actions based on the Sherman Act and those based on other antitrust statutes. *See, e.g., Porter Testing Laboratory v. Board of Regents for Oklahoma Agriculture & Mechanical Colleges*, 993 F.2d 768 (10th Cir.1993); *Cine 42nd Street Theater Corp. v. Nederlander Organization, Inc.*, 790 F.2d 1032, 1039–40 (2d Cir.1986); I Phillip Areeda & Don-

ald F. Turner, *Antitrust Law* ¶ 218 (1978). In *FTC v. Ticor Title Insurance Co.*, — U.S. —, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992), the Supreme Court noted the possibility that state action immunity may not apply to alleged violations of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), but it declined to reach the issue because the parties had not raised it. Similarly, this case involves claims based on antitrust statutes other than the Sherman Act, but the Oil Dealers have not argued that the state action immunity doctrine does not apply to claims asserted under the other statutes. We therefore will not distinguish among the antitrust claims asserted in deciding the state action immunity issue.

cies Act of 1978, 16 U.S.C. § 2601 *et seq.* ("PURPA"). PURPA, which the Pennsylvania statutes implement, provides that nothing in it "affects ... the applicability of the antitrust laws to any electric utility." 16 U.S.C. § 2603(1). The Oil Dealers thus argue that it is "totally inconsistent with PURPA to use the Pennsylvania legislation implementing [it] to exempt the utility's conduct from the antitrust laws." Oil Dealers' brief at 23. We disagree.

PURPA's plain language, which indicates that it is not intended to affect antitrust laws as they apply to utility companies, necessarily implies that both theories of liability and defenses apply with full force to utilities. Thus, we agree with the district court's holding that the fact that PURPA does not "affect the applicability" of the antitrust laws "cannot mean that PURPA reserves only antitrust liability but not antitrust defenses." *Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.,* 804 F.Supp. 700, 710 (E.D.Pa. 1992). PURPA's plain statutory language "establishes that [it] is to have no effect on the applicability of the state action doctrine to gas and electric utilities." *Nugget Hydroelectric,* 981 F.2d at 433.

### B.

Having concluded that PP & L may assert state action immunity in response to plaintiffs' claims, we must determine which party bears the burden of proving that the doctrine applies. The Oil Dealers argue that PP & L bears the burden because state action immunity is an affirmative defense. PP & L contends that the Oil Dealers bear the burden of showing that state action immunity does not shield the challenged activity from liability because, as plaintiffs, they bear the burden of establishing a cause of action under the antitrust laws.

In *Parker,* the Supreme Court treated the issue of state action immunity as one of preemption; it did not describe the doctrine as an affirmative defense. Cases since *Parker,* however, clarify that state action immunity is an affirmative defense as to which PP & L bears the burden of proof. *See Ticor II,* ― U.S. at ―, 112 S.Ct. at 2172 (state action immunity was "[o]ne of the principal

defenses" asserted); *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 38–39, 105 S.Ct. 1713, 1716, 85 L.Ed.2d 24 (1985) ("municipalities must demonstrate" that their actions were taken pursuant to state policy to obtain immunity); *Patrick,* 486 U.S. at 94, 108 S.Ct. at 1658–59 ("*respondents have not shown ...* the active supervision required to result in state action immunity") (emphasis added); *Ticor III,* 998 F.2d at 1139 ("The Supreme Court, however, expressly declared that when prices are initially set by private parties, *the person claiming immunity must show* that the state undertook steps to evaluate the rate setting scheme.") (emphasis added); *Nugget Hydroelectric,* 981 F.2d at 434 (party claiming immunity must demonstrate that its conduct satisfies requirements of state action immunity). *See also Cantor v. Detroit Edison Co.,* 428 U.S. 579, 600, 96 S.Ct. 3110, 3122, 49 L.Ed.2d 1141 (1976) (Stevens, J.) (in a section of the majority opinion which did not represent the opinion of the court, stating, "a claim of immunity or exemption is in the nature of an affirmative defense to conduct which is otherwise assumed to be unlawful").

### C.

PP & L thus bears the burden of proof, and first it must demonstrate that it offered its RTS Rate to consumers, and cash grants and other incentives free of all-electric development agreements to builders and developers, pursuant to a clearly articulated and affirmatively expressed state policy. *Midcal,* 445 U.S. at 105, 100 S.Ct. at 943; *Ticor I,* 922 F.2d at 1129. We conclude that it did.

Contrary to the Oil Dealers' contention, a state policy need not be aimed at restraining competition for a person acting pursuant to that policy to be immune from antitrust liability. In *City of Columbia v. Omni Outdoor Advertising, Inc.,* 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991), the Court stated,

> We have rejected the contention that this requirement can be met only if the delegating statute explicitly permits the displacement of competition.... It is enough, we have held, if suppression of

competition is the "foreseeable result" of what the statute authorizes....

*Omni,* 499 U.S. at 373, 111 S.Ct. at 1350, quoting *Hallie,* 471 U.S. at 42, 105 S.Ct. at 1718.[8] *See also Ticor I,* 922 F.2d at 1130–31. Accordingly, to satisfy the clear articulation requirement, a defendant need only show that "the legislature contemplated the kind of action complained of." *Hallie,* 471 U.S. at 44, 105 S.Ct. at 1719 (quotation omitted). *See also Hancock Industries v. Schaeffer,* 811 F.2d 225 (3d Cir.1987).

■ PP & L is regulated by the Pennsylvania Public Utilities Commission (the "PUC" or the "Commission"). The PUC is an independent state administrative commission authorized to regulate public utility companies doing business in Pennsylvania. *See* 66 Pa.Cons.Stat.Ann. §§ 301, 501. Pursuant to its statutory authority, it has directed that utilities such as PP & L consider "conservation, load management, and alternate energy supply products" as alternatives to expanding capacity and cost-reduction measures. 52 Pa.Code § 69.31. *See also* 52 Pa.Code § 69.34. The Pennsylvania legislature requires each utility to submit annually

> information concerning its future plans to meet its customer demand, including ...:
>
> (3) A year-by-year examination of the potential for promoting and ensuring the full utilization of all practical and economical energy conservation for the next twenty years and a discussion of how existing and planned utility programs do or do not adequately reach this potential. Such programs should include, but not be limited to, educational, audit, loan, rebate, third-party financing and load management efforts to shift load from peak to off-peak periods.

66 Pa.Cons.Stat.Ann. § 524(a)(3).

The Oil Dealers agree that this statutory scheme expresses a state policy in favor of energy conservation and load management

but argue that the policy cannot support a claim of state action immunity because it is at best neutral as to competition. *Community Communications Co., Inc. v. City of Boulder,* 455 U.S. 40, 55, 102 S.Ct. 835, 842–43, 70 L.Ed.2d 810 (1982). *See also Cantor,* 428 U.S. 579, 96 S.Ct. 3110 (state policy giving a commission power to regulate rates is only neutral as applied to an electric utility's program, approved in rate tariff, to distribute free light bulbs to customers). In fact, the legislature has admonished that

> Neither the submission to the commission of the information required by subsection (a) or [sic] the issuance by the commission of a report on the information, or anything contained in such reports, or any action taken by the commission as a result of the issuance of such reports, shall be considered or construed as approval or acceptance by the commission of any of the plans, assumptions or calculations made by the public utility and reflected in the information submitted.

66 Pa.Cons.Stat.Ann. § 524(d). Thus, the Oil Dealers argue that Pennsylvania's statutory scheme does nothing more than authorize PP & L's allegedly anticompetitive activity. If that were the case, PP & L would not be immune from liability for its actions. *Omni,* 499 U.S. at 378–79, 111 S.Ct. at 1353; *Parker,* 317 U.S. at 351, 63 S.Ct. at 313–14.

State approval of PP & L's activity is not required for immunity to attach, however. *Southern Motor Carriers,* 471 U.S. at 61 n. 23, 105 S.Ct. at 1729 n. 23 ("clearly articulated permissive policy" will suffice). Simply accepting the proposition that Pennsylvania did not intend to regulate competition between electric utilities and fossil fuel dealers does not mean that Pennsylvania intended to refrain completely from entanglement in any issue affecting the competitive interaction between the two. As noted previously, the issue in determining whether actions were taken pursuant to a clearly articulated state

---

8. *Omni* and *Hallie* involved immunity of municipalities under the state action immunity doctrine, but the test to be applied in determining whether a state policy can support a claim of immunity is the same for municipalities as it is for private actors. The distinction between the two types of cases lies in the fact that private actors, unlike

municipalities, must prove a second proposition—that their actions were actively supervised by the state—to obtain immunity for their actions. *See Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 46, 105 S.Ct. 1713, 1720, 85 L.Ed.2d 24 (1985).

policy is whether the challenged activity is a "'foreseeable result' of what the statute authorizes." *Omni*, 499 U.S. at 372–73, 111 S.Ct. at 1350, *quoting Hallie*, 471 U.S. at 42, 105 S.Ct. at 1718. Permitting companies to grant loans or rebates for energy-saving systems could easily be foreseen to provide one company with a competitive advantage over another, whether the other company provides the same or a competing service. Therefore, it is reasonably foreseeable that rebates, loans and other load management programs utilities are required to consider could have anticompetitive effects.

■ The Oil Dealers respond that PP & L's practices do not represent attempts to engage in energy conservation or load-shifting. Therefore, they argue, even if Pennsylvania's statutory scheme reasonably contemplates anticompetitive effects flowing from rebates and loans offered to further energy conservation and load management, PP & L cannot be immune from liability for engaging in the challenged activities. They contend that the district court engaged in fact-finding—which, of course, would be impermissible at the summary judgment stage—when it ruled that PP & L's activities represented energy conservation or load-shifting efforts.

In so arguing, the Oil Dealers misconstrue the court's function when deciding whether a practice was established pursuant to a state policy. The district court did not engage in fact-finding; rather, in recognizing that state law governs the issue whether Pennsylvania has articulated a state policy favoring PP & L's activities, it merely attempted to predict how the Pennsylvania Supreme Court would rule on that issue by examining and giving deference to PUC findings. *See Yeager's Fuel*, 804 F.Supp. at 708, *citing Ticor I*, 922 F.2d at 1132, 1134. We approve of both the

manner in which the district court analyzed the issue and the conclusion it reached.

The PUC's Bureau of Conservation, Economics & Energy Planning (the "Bureau"), in response to inquiries from state legislators and outcry from the petroleum industry, examined PP & L's programs in 1989. In an internal report, the Bureau found that PP & L's offering of certain incentives to owners and builders to install high-efficiency electric heating systems in new homes was a legitimate load management program. App. at 1811–12.[9]

■ The Oil Dealers argue that we should not consider the views of a bureau of a state commission to determine state policy. In Pennsylvania, the PUC has been entrusted with "full power and authority ... to enforce, execute and carry out, by its regulations, orders, or otherwise, ... the provisions of [the Code] and the full intent thereof." 66 Pa.Cons.Stat.Ann. § 501(a). The PUC has the authority to evaluate the prudence and cost-effectiveness of utilities' energy conservation and load management programs. 66 Pa.Cons.Stat.Ann. § 1319. Clearly, we may accord the PUC's views weight. *See Ticor I*, 922 F.2d at 1134.

■ The Bureau, of course, is one step removed from the PUC. The legislature itself, however, in addition to charging the Bureau with conducting studies and research and advising the PUC, has charged the Bureau with "the development of an effective program of energy conservation." 66 Pa. Cons.Stat.Ann. § 308(c). In an audit of the PUC, the legislature recognized that the Bureau in part "reviews company plans for new conservation programs and provides feedback to utilities on improvements for program design." App. at 2660. Therefore, it would appear that the Bureau, even though

---

9. PP & L apparently did not mention to the Bureau or the PUC that some of these benefits were provided pursuant to all-electric development agreements. *See* Pennsylvania's *amicus* brief at 5. Because PP & L does not here contend that benefits given to builders and developers as part of all-electric development agreements merit state action immunity, we need only examine the Bureau's findings as to benefits provided in the absence of such agreements. Therefore, since we are not according immunity to PP

& L for activity which may not have been revealed or which may have been misrepresented to the Bureau and the PUC, there is no need either to decide whether PP & L actually misrepresented or omitted certain information when describing its activity to the PUC, or to consider the Oil Dealers' argument that a defendant may not be accorded *state action immunity when it* has engaged in "predation by abuse of governmental process." *Cf.* Bork, *The Antitrust Paradox* at 349–51.

only a PUC bureau, is the authority on Pennsylvania's conservation policy. We will accord weight to its view that PP & L's programs were legitimate load management programs. Our decision to do so, in turn, requires the conclusion that PP & L engaged in the challenged activities in accordance with a clearly articulated state policy promoting load management.

We likewise reject the Oil Dealers' argument that we should not consider the Bureau report as an indication of state policy because it is only an "informal opinion." The PUC's Rules of Administrative Practice and Procedure provide that "informal opinions, whether oral or written, expressed by Commissioners, presiding officers, legal counsel, employe[e]s or representatives of the Commission are only considered as aids to the public, do not have the force and effect of law or legal determinations, and are not binding upon the Commonwealth or the Commission." 52 Pa.Code § 1.96. This provision does not appear to apply to the Bureau's report, even if it is purely internal, for the report does not constitute an "opinion" in the sense the term is used in the rule. In any event, the rule certainly does not undermine the fact that the Bureau, which in Pennsylvania is charged with overseeing utilities' energy conservation efforts, believed that PP & L's programs, at least insofar as they did not involve all-electric development agreements, were undertaken in accordance with state conservation policy.

▇▇ Since the district court's decision, the PUC has adopted new regulations which tend to discredit the Bureau's view of PP & L's activity. The PUC now requires that any demand-side management activity on the part of a utility company be approved prior to implementation. App. at 4683, 4693. It also now prohibits the use of cash to influence builders and developers. 52 Pa.Code § 57.63; see app. at 4688 (commenting that, under the new regulations, "utilities are specifically prohibited from delivery of allowances such as cash or appliances to builders and developers in order to influence their choice of energy for use in new residential developments").

The fact that the PUC now prohibits such actions does not mean that PP & L should be denied state action immunity for its past activity, however. As we recognized in *Ticor I*, a private defendant reasonably relying on apparently lawful government action should not be deprived of state action immunity if the government later reverses its position. *Ticor I*, 922 F.2d at 1133, *citing* P. Areeda & H. Hovenkamp, *Antitrust Law* § 212.4b at 153 (1989 supp.). *See also Lease Lights, Inc. v. Public Service Co. of Oklahoma*, 849 F.2d 1330, 1334 (10th Cir.1988); II American Bar Association Section on Antitrust Law, *Antitrust Law Developments (Third)* 972. Indeed, it would be entirely unfair to hold that PP & L did not act in accordance with state policy when its activity had received the imprimatur of the Bureau merely because the PUC later revised this position.

▇▇ We now turn to the Oil Dealers' argument that according PP & L state action immunity in this case would be inconsistent with the Supreme Court's decision in *Cantor*. Leaving aside questions regarding the continued viability of *Cantor*'s holding, *see Yeager's Fuel*, 804 F.Supp. at 711 n. 18, we find no inconsistency. To the contrary, our conclusion that Pennsylvania has clearly articulated a state policy requiring energy conservation and load management efforts such as those challenged in this lawsuit does not conflict with *Cantor* in any way.

In *Cantor*, a retail druggist who sold light bulbs alleged that the Detroit Edison Company ("Detroit Edison") was using its monopoly power as a provider of electricity to restrain competition in the sale of light bulbs. *Cantor*, 428 U.S. at 581–82, 96 S.Ct. at 3113. Detroit Edison implemented a "light bulb exchange program," pursuant to which it provided limited numbers of light bulbs to its customers, in the late 1800s, before the state of Michigan began regulating electric utilities. In 1916, the Michigan Public Utilities Commission (the "Michigan PUC") approved a Detroit Edison tariff explaining the program. It also approved Detroit Edison's subsequent tariffs and a decision on Detroit Edison's part to eliminate the program for large commercial customers, thus implying continued approval of the program. *See id.*

at 583, 96 S.Ct. at 3114. Neither the Michigan PUC nor the Michigan legislature "ever made any specific investigation of the desirability of a lamp exchange program or of its possible effect on competition in the lightbulb market," but because the Michigan PUC had approved its tariff, Detroit Edison could not abandon the program until a new tariff was approved. *Id.* at 584–85, 96 S.Ct. at 3114–15.

Although the case was decided before the Court clearly delineated its two-pronged test for state action immunity, the *Cantor* Court in essence ruled that Michigan had not clearly articulated a policy encompassing the light bulb program. *See Cantor,* 428 U.S. at 585, 96 S.Ct. at 3115 ("We infer that the State's policy is neutral on the question whether a utility should, or should not, have such a program."). It based its conclusion on the facts that although the Michigan PUC was charged with rate regulation, Michigan did not regulate the distribution of light bulbs; no state statute mentioned light bulb exchange programs; neither the legislature nor the Michigan PUC investigated the program; the program began before the Michigan PUC was created; and no other electric utility in the state offered such a program. *Id.* at 583–85, 96 S.Ct. at 3114–15.

In contrast, in this case, Pennsylvania statutes expressly provide for PUC regulation of rates, foresee the establishment of rebate and load management programs and authorize the PUC to evaluate such programs. The PUC has approved the RTS Rate and, acting through the Bureau, has investigated PP & L's rebate and incentive programs. Other utilities have similarly offered special rates to consumers, app. at 229–329, and may even have offered incentives to builders or developers. *See, e.g.,* app. at 272, 285, 300, 307. *Cantor* does not compel a different conclusion from the one we reach here.

For all of these reasons, we think it is clear that PP & L offered its RTS Rate, cash grants and other incentives which were not part of all-electric development agreements pursuant to a clearly articulated and affirmatively expressed state policy of promoting load management and energy conservation.

### D.

Second, PP & L must demonstrate that Pennsylvania actively supervised its incentive programs and RTS Rate. "Actual state involvement, not deference to private [anticompetitive activity] under the general auspices of state law, is the precondition for immunity from federal law. Immunity is conferred out of respect for ongoing regulation by the State, not out of respect for the economics of [the challenged activity]." *Ticor II,* — U.S. at — – —, 112 S.Ct. at 2176–77. It is this "active supervision" prong of the state action immunity test which "prevents States from 'casting ... a gauzy cloak of state involvement over what is essentially [private anticompetitive activity].'" *Southern Motor Carriers,* 471 U.S. at 61 n. 23, 105 S.Ct. at 1729 n. 23, *quoting Midcal,* 445 U.S. at 106, 100 S.Ct. at 943–44. "'The active supervision prong ... requires that state officials have and exercise power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy.'" *Ticor II,* — U.S. at —, 112 S.Ct. at 2177, *quoting Patrick,* 486 U.S. at 100–01, 108 S.Ct. at 1662–63.

*Ticor* involved title insurance rates which were set by ratesetting bureaus which, in turn, were comprised of member title insurance companies. Faced with an antitrust challenge, the insurance companies argued that their ratesetting action was immune because of their states' regulatory schemes, pursuant to which state commissions had "approved" the rates set by the bureaus by not rejecting them within a certain period of time. The Court explained:

Our decisions make clear that the purpose of the active supervision inquiry is not to determine whether the State has met some normative standard, such as efficiency, in its regulatory practices. Its purpose is to determine whether the State has exercised sufficient independent judgment and control so that the details of the rates or prices have been established as a product of deliberate state intervention, not simply by agreement among private parties. Much as in causation inquiries, the analysis asks whether the State has played

a substantial role in determining the specifics of the economic policy. *The question is not how well state regulation works but whether the anticompetitive scheme is the State's own.*

*Ticor II,* —— U.S. at ——, 112 S.Ct. at 2177 (emphasis added). Because of the "negative option" method in which the rates were "approved," the Court held that the title insurance ratesetting in question was not actively supervised and thus did not qualify for state action immunity. *Id.* —— U.S. at ——, 112 S.Ct. at 2179.

The PUC unquestionably has the power to review PP & L's programs. 66 Pa.Cons.Stat. Ann. §§ 501, 1309(a). Therefore, we need only consider whether it actually did so in a manner which satisfies the *Ticor* test. Such an analysis is best understood by separately examining the challenged activities. We will first consider the RTS Rate.

### 1.

The PUC has actually approved PP & L's RTS Rate in the tariffs PP & L must file under state law. App. at 705–35; *Pennsylvania Public Utility Commission v. Pennsylvania Power & Light Co.,* 55 P.U.R.4th 185 (1983) and 67 P.U.R.4th 30 (1985). Furthermore, its approval of this rate has amounted to more than mere examination for mathematical accuracy, *cf. Ticor II,* —— U.S. at ——, 112 S.Ct. at 2179, for it has actually considered complaints about the RTS Rate and decided that it served energy conservation and load management purposes. By law, PP & L now must charge this rate until the PUC approves a new tariff permitting it to charge some other rate or rates. 66 Pa.Cons.Stat.Ann. § 1303.

Clearly, Pennsylvania has actively supervised the RTS Rate. *Cf. DFW Metro Line Services v. Southwestern Bell Telephone Corp.,* 988 F.2d 601, 606 (5th Cir.1993). The PUC has affirmatively approved it, after considered study which included more than a review for mathematical accuracy. App. at 705–35; *Pennsylvania Public Utility Commission v. Pennsylvania Power & Light Co., supra; cf. Ticor II,* —— U.S. at ——, 112 S.Ct. at 2179. Thus, we conclude that PP & L is immune from liability for its RTS Rate.

### 2.

Next, we will consider whether Pennsylvania has actively supervised PP & L's offering cash grants and other incentives to builders and developers insofar as those incentives were not part of all-electric development agreements. On this issue, PP & L makes much of the fact that, as required by statute, it annually has described its Four-Star Home program to the PUC through the Bureau. This reporting alone does not indicate active supervision because the Bureau does no more than review the reports. *Cf. Ticor II,* —— U.S. at ——, 112 S.Ct. at 2179. In fact, as noted previously, the statute itself discounts any theory that the submission of the reports constitutes approval of them. 66 Pa.Cons.Stat.Ann. § 524(d).

It is nevertheless clear that the Bureau has considered these programs more extensively than simply reviewing PP & L's reports upon submission. As explained previously, in November, 1989, the Bureau issued a final staff report reviewing PP & L's programs in response to inquiries from the legislature and protests by fossil fuel dealers. In the report, it indicated that it believed that PP & L's programs constituted valid energy conservation and load management efforts. App. at 1810 *et seq. See also* app. at 1765. We do not view the PUC's refusal to release this report as affecting whether we should accord it weight.

It is also clear that the PUC was aware that PP & L's programs involved not just incentives to homeowners themselves but incentives to builders and developers as well. *See, e.g.,* app. at 351, 362, 366. *See also* Pennsylvania's *amicus* brief at 4. Through the Bureau, the PUC also knew that PP & L's programs not only shifted current use of electricity but also attracted new electrical heating accounts. App. at 1811.

Further, as noted previously, the PUC has issued new regulations governing programs such as PP & L's. These regulations were the result of meetings and planning sessions which were themselves an outgrowth of the Oil Dealers' having voiced the same complaints to the PUC as they have asserted in

this lawsuit. App. at 98–103, 361–66. The Oil Dealers have even commented on the proposed regulations which are now in effect. *See* app. at 339, 4681–88. Thus, the PUC heard and presumably considered the Oil Dealers' allegations but, until issuing its new regulations, considered PP & L's programs (insofar as they did not include all-electric development agreements) to be valid attempts to engage in energy conservation as the legislature required. Therefore, we conclude that PP & L is immune from antitrust liability for those programs, for they have been actively supervised.

### III.

As noted previously, PP & L does not claim to be immune from antitrust liability for actions undertaken in connection with all-electric development agreements. It thus urges us to examine the merits of the Oil Dealers' claims regarding incentives offered in conjunction with all-electric development agreements. PP & L asks that we affirm the district court's grant of summary judgment on those claims because the Oil Dealers have not advanced evidence to support them; however, a review of the procedural history of this case helps explain our disinclination to do so.

The *Yeager's* plaintiffs filed suit on August 12, 1991; the plaintiffs in *Losch* did not file suit until April 22, 1992. By that time, there had been a great deal of activity in the *Yeager's* case.

Specifically, in November, 1991, PP & L had moved for dismissal of the *Yeager's* case under Fed.R.Civ.P. 12(b)(6), arguing both state action immunity and failure to state a claim upon which relief could be granted. Attached to its motion were various documents offered in support of its state action immunity defense. Because it would be considering matters outside the pleadings in deciding that motion, the district court in January, 1992, ordered that PP & L's motion to dismiss be treated as a motion for summary judgment, permitted some discovery and granted the *Yeager's* plaintiffs additional time to reply.

In April, 1992, however, apparently for administrative reasons, the district court dismissed PP & L's pending motion to dismiss without prejudice to its being refiled as a motion for summary judgment. PP & L did just that, filing a motion for summary judgment which relied solely on the reasons set forth in its previous motion, appendix and brief. Although PP & L finally argued in its reply brief that the *Yeager's* plaintiffs had not produced sufficient evidence to support their claims, rather than that they had simply failed to allege claims upon which relief could be granted, the district court denied both the *Yeager's* plaintiffs' motion to respond to that reply and their request for additional discovery under Rule 56(f) of the Federal Rules of Civil Procedure.

After the *Losch* complaint was filed, the plaintiff in *Losch* moved to consolidate the two cases for pretrial purposes. The court held a hearing, at which the scope of PP & L's summary judgment motion was discussed. The district court did not explicitly decide whether PP & L's challenge to the merits of the Oil Dealers' claims would be considered under a Rule 12(b)(6) or a Rule 56 standard. It did, however, grant the *Losch* plaintiff's motion to consolidate "the state action immunity issue and all federal claims …. asserted in either the *Yeager's* or *Losch* cases." App. at 2457.

The confusion as to how the court would treat PP & L's arguments on the merits of the Oil Dealers' claims—that is, whether it would consider only the sufficiency of their averments, or determine whether they had produced evidence sufficient to survive summary judgment—continued through the argument on PP & L's motion. At that argument, the district court stated that a Rule 56 standard would apply, app. at 106–11, but in its opinion, the court ruled that it need not address the issue of which standard it should use to address the merits because it would grant summary judgment entirely on state action immunity grounds. *See Yeager's Fuel*, 804 F.Supp. at 703–04 n. 3.

Relying upon *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), PP & L now argues that it should be granted summary judgment on the Oil Deal-

ers' claims of attempted monopolization of the heating market through all-electric development agreements because the Oil Dealers have not come forward with evidence to support their claims. In *Celotex*, the Supreme Court stated that a nonmovant who will bear the burden of proof at trial must go beyond the pleadings in order to survive a motion for summary judgment, even when the moving party has not produced evidence to support its motion. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. However, as the Court also recognized in *Celotex*:

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. at 2552. In this case, PP & L did not meet its initial burden with respect to the merits. In its motion, it merely informed the court that the complaint itself was inadequate; it was not until it filed its reply brief, to which the Oil Dealers were precluded from responding, that it raised the argument that the Oil Dealers could not support their claims with adequate evidence.

Furthermore, even if PP & L had argued insufficiency of the evidence on the merits earlier, the Oil Dealers had a right not to be " 'railroaded' by a premature motion for summary judgment." *Id.* at 326, 106 S.Ct. at 2554. In this case, the Oil Dealers sought further discovery through a Rule 56(f) affidavit and an opportunity to respond to PP & L's arguments that they could not carry their evidentiary burden in a surreply brief. The district court refused both requests.

In light of the confusion surrounding PP & L's arguments on the merits before the district court, and because the Oil Dealers may not have had the opportunity for full discovery and argument with respect to the merits, we will decline at this time to entertain PP & L's arguments that the Oil Dealers have failed to produce sufficient evidence to survive summary judgment on the merits of their remaining claims. *Cf. J.F. Feeser, Inc.*

*v. Serv–A–Portion, Inc.*, 909 F.2d 1524, 1542 n. 18 (3d Cir.1990) (recognizing that "[i]t would be unfair" to require a plaintiff to specify evidence needed to substantiate Sherman Act claim in Rule 56(f) affidavit "when it was without notice that the district court intended to consider and resolve the entire Sherman Act claim").

## IV.

For the foregoing reasons, we will affirm the district court's grant of summary judgment to PP & L as to the Oil Dealers' claims based upon the RTS Rate and incentives which were not offered in conjunction with all-electric development agreements. We will reverse the district court's judgment insofar as it granted summary judgment to PP & L for incentives offered in conjunction with such agreements, however. Because this partial reversal reintroduces federal claims into each of the *Losch* and the *Yeager's* cases, we will also reverse the district court's dismissal of the *Losch* state-law claims pursuant to 28 U.S.C. § 1367(c).

### SUR PETITION FOR REHEARING

June 6, 1994

PRESENT: MANSMANN, GREENBERG and LEWIS, Circuit Judges.

The petition for panel rehearing filed by the appellants in the above entitled case having been submitted to the judges who participated in the decision of this court, and no judge who concurred in the decision having asked for rehearing, the petition for panel rehearing is denied.